## HANOVER STAR MILLING COMPANY *v.* METCALF.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

## ALLEN & WHEELER COMPANY *v.* HANOVER STAR MILLING COMPANY.

### APPEAL FROM AND CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 23.  Argued May 7, 10, 1915; No. 30.  Argued May 10, 1915.—
Decided March 6, 1916.

Two District Courts in different circuits having granted temporary injunctions, and both Circuit Courts of Appeals having reversed upon grounds that went to the merits and differed upon fundamental questions affecting the same trade-mark, writs of certiorari were allowed by this court before final decrees notwithstanding the general rule to the contrary.

Where neither of the parties, citizens of different States, has registered the trade-mark in dispute under any act of Congress or under the law of any State, and no local rule arising from statute or decision is shown, cases involving the use of such trade-mark must be determined according to applicable common-law principles.

Redress accorded in trade-mark cases is based upon the party's right

to be protected in the good will of the trade or business; and the English rule that a trade-mark is not the subject of property, except in connection with an existing business, prevails generally in this country.

The common law of trade-marks is but a part of the broader law of unfair competition.

While common-law trade-marks and the right to their exclusive use may be classed among property rights, the right grows out of use and not mere adoption.

Where two parties independently employ the same trade-mark or name, not in general use and susceptible of adoption, upon goods of the same class but in separate and remote markets, the question of prior appropriation is legally insignificant in the absence of intent on the part of the later adopter to take the benefit of the reputation, or to forestall extension of the trade, of the earlier adopter.

While property in a trade-mark is not limited, so far as its use has extended, by territorial bounds, the earlier adopter may not monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another.

So far as controversy over a trade-mark concerns intrastate distribution as distinguished from interstate trade the subject is not within the sovereign power of the United States.

Trade-mark rights, like others that rest in user, may be lost by abandonment, non-user, laches or acquiescence.

Where a later adopter, in good faith and without notice of its use in other territory by an earlier adopter, expends money and effort in building up a trade in a territory, which the earlier adopter has left unoccupied for a long period—in this case more than forty years—and into which his trade would not naturally expand, the earlier adopter is estopped to assert trade-mark infringement in that territory.

A third party who enters the territory of such second adopter and attempts to use the trade-name in a manner calculated to, and which does, deceive by similarity of package, even though the name of the actual manufacturer is placed thereon, is guilty of unfair competition from which the user of the trade-mark is entitled to protection.

There being diverse citizenship and the jurisdiction of the District Court resting thereon the decision of the Circuit Court of Appeals in a trade-mark case is final and an appeal from the decree is dismissed and the decree is reviewed here on certiorari.

204 Fed. Rep. 211, reversed.
208 Fed. Rep. 513, affirmed on certiorari and appeal therefrom dismissed.

THE facts, which involve the rights of manufacturers of and dealers in flour to the use of "Tea Rose" as a trade-mark, for flour sold in certain territory, and the effect of non-user on right to use a trade-mark, are stated in the opinion.

Mr. Edgar L. Clarkson and Mr. Henry Fitts, with whom Mr. James E. Morrisette and Mr. John London were on the brief, for Hanover Star Milling Company.

Mr. J. Fred Gilster and Mr. Edward Everett Longan for Metcalf.

Mr. J. Fred Gilster and Mr. Edward Everett Longan, with whom Mr. L. O. Whitney was on the brief, for Allen & Wheeler Company.

MR. JUSTICE PITNEY delivered the opinion of the court.

These cases were argued together, and may be disposed of in a single opinion.

In No. 23, the Hanover Star Milling Company, an Illinois corporation engaged in the manufacture of flour in that State, filed a bill in equity on March 4, 1912, in the United States District Court for the Middle District of Alabama, against Metcalf, a citizen of the State of Alabama and a merchant engaged in the business of selling flour at Greenville, Butler County, in that State, to restrain alleged trade-mark infringement and unfair competition. The bill averred that for twenty-seven years last past complainant had been engaged in the manufacture of a superior and popular grade of flour, sold by it at

all times under the name of "Tea Rose" flour, in a wrapping with distinctive markings, including the words "Tea Rose" and a design containing three roses imprinted upon labels attached to sacks and barrels; that this flour had been marketed thus by complainant in the State of Alabama for the preceding twelve years, during which time, by maintaining a high and uniform quality, by expensive advertising, and by diligent work of its representatives, it had built up a large and lucrative market, with annual sales of more than $175,000 of Tea Rose flour in that State, and had established a valuable reputation for the name "Tea Rose" and the distinctive wrappings in Alabama and other States, particularly Georgia and Florida; that until shortly before the commencement of the suit complainant's Tea Rose flour was the only flour made, sold, or offered for sale under that name in Butler County or elsewhere in the State of Alabama, and the name "Tea Rose" had represented and stood for complainant's flour; and that recently the Steeleville Milling Company, of Steeleville, Illinois, had, through Metcalf's agency, been marketing in Alabama, and particularly in Butler County, flour of its manufacture, in packages and wrappings substantially identical with complainant's and bearing a design containing three roses and the name "Tea Rose" upon the labels, in a manner calculated to deceive and in fact deceptive to purchasers, thereby threatening pecuniary loss to complainant exceeding $3,000 in amount and destroying the prestige of complainant's "Tea Rose" flour and damaging its trade therein.

Defendant's answer denied all attempts to deceive purchasers, and further denied complainant's right to the exclusive use of the words "Tea Rose" or the picture of a rose as a trade-mark; averred that long prior to complainant's first use of it, and as early as the year 1872, the name had been adopted, appropriated, and used as

a trade-mark for flour by the firm of Allen & Wheeler, of Troy, Ohio, and used by it and its successor, The Allen & Wheeler Company, continuously as such; and alleged that the Steeleville Milling Company had used its "Tea Rose" brand for more than sixteen years last past, and as early as the year 1899 had sold flour in Alabama under that label.

Upon consideration of the bill and answer and affidavits submitted by the respective parties, the District Court granted a temporary injunction restraining Metcalf from selling flour labeled "Tea Rose," manufactured by the Steeleville Company or any person, firm, or corporation other than the Hanover Company, at Greenville, or at any other place in the Middle District of Alabama. Upon appeal, the Circuit Court of Appeals for the Fifth Circuit reversed this decree and remanded the cause with directions to dismiss the bill. 204 Fed. Rep. 211. A writ of certiorari was then allowed by this court.

In No. 30, The Allen & Wheeler Company, a corporation of the State of Ohio, manufacturing flour at the City of Troy in that State, filed a bill against the Hanover Star Milling Company on May 23, 1912, in the United States District Court for the Eastern District of Illinois, averring that in or before the year 1872 the firm of Allen & Wheeler, then engaged in the manufacture of flour at Troy, adopted as a trade-mark for designating one of its brands the words "Tea Rose," and from thence until the year 1904 continuously used that trade-mark by placing it upon sacks, barrels, and packages containing the brand and quality of flour designated by that term and sold throughout the United States; that in 1904 the Allen & Wheeler Company was incorporated and took over the mills, machinery, stock, trade-mark, and good-will of the firm, since which time the corporation had continued to use the trade-mark upon flour of its manufacture, and had distributed and sold such flour in the mar-

kets of the United States, whereby the words "Tea Rose" had become the common-law trade-mark of the Allen & Wheeler Company; that recently it had learned that the Hanover. Star Milling Company had adopted the words "Tea Rose" as designating a brand of flour manufactured by. it, and, notwithstanding notice of complainant's rights, was persisting in the sale of its flour under that name and threatening to continue so to do; and that defendant had sold large quantities of Tea Rose flour, particularly in the markets of the States of Alabama, Florida, and Mississippi, with large gross sales, and profits approximating $5,000 per year for the past five years, causing damage and loss to complainant in excess of $3,000. An injunction and an accounting of profits were prayed. Upon this bill, a demurrer filed by the Hanover Company, and affidavits presented by both parties, the District Court granted a temporary injunction restraining the use of the words "Tea Rose" as a trademark for flour, without territorial restriction. The Circuit Court of Appeals for the Seventh Circuit reversed this decree, and remanded the cause to the District Court for further proceedings not inconsistent with its opinion. *Hanover Star Milling Co.* v. *Allen & Wheeler Co.*, 208 Fed. Rep. 513. An appeal was taken to this court, and a writ of certiorari was subsequently granted. The appeal must be dismissed for want of jurisdiction, and the case will be disposed of under the writ of certiorari.

No question is raised respecting the propriety of passing upon the questions at issue on a review of decisions rendered upon applications for temporary injunction. Both District Courts granted such injunctions, and both Circuit Courts of Appeals reversed upon grounds that went to the merits. These courts differed upon fundamental questions, and it was because of this that the writs of certiorari were allowed, the situation being such that it was deemed proper to allow them before final decrees

were made, notwithstanding the general rule to the con-
trary. *American Const. Co. v. Jacksonville Ry.*, 148 U. S.
372, 378, 384; *The Three Friends*, 166 U. S. 1, 49; *The
Conqueror*, 166 U. S. 110, 113; *Denver v. N. Y. Trust Co.*,
229 U. S. 123, 133.

In both cases it was shown without dispute that the
firm of Allen & Wheeler adopted and used the words "Tea
Rose" as a trade-mark for one kind or quality of flour
manufactured by it as early as the year 1872, and con-
tinued that use until the year 1904, when the Allen &
Wheeler Company was incorporated and took over the
mills, machinery, stock, trade-mark, and good-will of the
firm and succeeded to its business. But there is nothing
to show the extent of such use or the markets reached by
it, except that in the year 1872 Allen & Wheleer sold
three lots of 25 barrels each to a firm in Cincinnati, Ohio,
and one lot of 100 barrels to a firm in Pittsburgh, Pennsyl-
vania; that in the early 70's another firm in Pittsburgh
was a customer for this brand; and that in the later 70's
a firm in Boston, Massachusetts, was a customer for the
same brand. As to the Allen & Wheeler Co., there are
affidavits stating in general terms that since its incor-
poration in 1904, and "continuously down to the present
time," the company has used the brand "Tea Rose" for
flour; but there is a remarkable absence of particular state-
ments as to time, place, or circumstances; in short, no
showing whatever as to the extent of the use or the markets
reached. There is nothing to show that the Allen &
Wheeler "Tea Rose" flour has been even advertised in
Alabama or the adjoining States, and there is clear and
undisputed proof that it has not been sold or offered for
sale or known or heard of by the trade in Alabama, Mis-
sissippi, or Georgia. In No. 30, there is uncontradicted
proof that the Allen & Wheeler Co. is selling flour in
Alabama and Georgia, but under the brands "Eldean
Patent" and "Trojan Special."

In both suits, the Hanover Star Milling Company introduced affidavits fairly showing that shortly after its incorporation in the year 1885 it adopted for one of its brands of flour the name "Tea Rose," and adopted for the package or container, whether sack or barrel, a label bearing the name "Tea Rose" and the design already referred to; and that this trade-mark was adopted and used in good faith without knowledge or notice that the name "Tea Rose" had been adopted or used by the Allen & Wheeler firm, or by anybody else. In 1904 the Hanover Company began and has since prosecuted a vigorous and expensive campaign of advertising its Tea Rose flour, covering the whole of the State of Alabama, and parts of Mississippi, Georgia, and Florida, employing many ingenious and interesting devices that are detailed in the proofs, with the result that at the commencement of the litigation its sales of Tea Rose flour in these markets amounted to more than $150,000 a year, the Hanover Star Milling Company has come to be known as the Tea Rose mill, the reputation of the mill is bound up with the reputation of Tea Rose flour, and "Tea Rose" in the flour trade in the territory referred to means flour of the Hanover Company's manufacture. There is nothing to show any present or former competition in Tea Rose flour between the latter company and the Allen & Wheeler firm or corporation, or that either party has ever advertised that brand of flour in territory covered by the activities of the other.

Metcalf's purchases of competing Tea Rose flour, which gave rise to the suit brought by the Hanover Company against him, were made from the Steeleville Milling Company, an Illinois corporation, which appears to have adopted the name and design of a tea rose for flour in the year 1895.

It should be added that, so far as appears, none of the parties here concerned has registered the trade-mark

under any act of Congress or under the law of any State. Nor does it appear that in any of the States in question there exists any peculiar local rule, arising from statute or decision. Hence, the cases must be decided according to common-law principles of general application.

Interesting and important questions are raised concerning the territorial extent of trade-mark rights. In behalf of the Hanover Company it is, in effect, insisted: (a) that the failure of the Allen & Wheeler Company and its predecessors to enter the south-eastern territory with their Tea Rose flour, and the fact that such flour has been and is wholly unknown there under that name, disentitle it to interfere with the Hanover Company's trade established in good faith in that territory under the same mark; (b) that the same considerations entitle Hanover to affirmative trade-mark rights of its own, enforceable against the Steeleville Company and everybody else over whom it has priority in that territory; and (c) that Hanover is entitled to relief against Steeleville and against Metcalf as its agent, upon the ground of unfair competition in trade regardless of the trade-mark right. An affirmative answer to the first proposition will decide the Allen & Wheeler case (No. 30) in favor of Hanover, and an affirmative answer to the third proposition will decide the Metcalf case (No. 23) in favor of Hanover, irrespective of the disposition that might be made of the second proposition. In view of possible consequences to the rights of parties not before the court, it is desirable to limit the range of our decision as much as practicable, especially as the proofs now before us are incomplete and in some respects unsatisfactory.

It will be convenient to dispose first of No. 30. Here the bill is rested upon alleged trade-mark infringement, pure and simple, and no question of unfair competition is involved. The decision of the Court of Appeals for the Seventh Circuit in favor of the Hanover Company and

against the Allen & Wheeler Company was rested upon
the ground that although the adoption of the Tea Rose
mark by the latter antedated that of the Hanover Com-
pany, its only trade, so far as shown, was in territory north
of the Ohio River, while the Hanover Company had
adopted "Tea Rose" as its mark in perfect good faith,
with no knowledge that anybody else was using or had
used those words in such a connection, and during many
years it had built up and extended its trade in the south-
eastern territory, comprising Georgia, Florida, Alabama,
and Mississippi, so that in the flour trade in that territory
the mark "Tea Rose" had come to mean the Hanover
Company's flour, and nothing else. The court held in
effect that the right to protection in the exclusive use of a
trade-mark extends only to those markets where the
trader's goods have become known and identified by his
use of the mark; and because of the non-occupancy by the
Allen & Wheeler Company of the southeastern markets it
had no ground for relief in equity. Let us test this by
reference to general principles.

. The redress that is accorded in trade-mark cases is based
upon the party's right to be protected in the good-will of a
trade or business. The primary and proper function of a
trade-mark is to identify the origin or ownership of the
article to which it is affixed. Where a party has been in
the habit of labeling his goods with a distinctive mark, so
that purchasers recognize goods thus marked as being of
his production, others are deb...         om applying the
same mark to goods of the same desc · tion, because to
do so, would in effect represent their goods to be of his
production and would tend to deprive him of the profit,
he might make through the sale of the goods which the
purchaser intended to buy. Courts afford redress or relief
upon the ground that a party has a valuable interest in the
good-will of his trade or business, and in the trade-marks
adopted to maintain and extend it. The essence of the

wrong consists in the sale of the goods of one manufacturer or vendor for those of another. *Canal Co.* v. *Clark,* 13 Wall. 311, 322; *McLean* v. *Fleming,* 96 U. S. 245, 251; *Manufacturing Co.* v. *Trainer,* 101 U. S. 51, 53; *Menendez* v. *Holt,* 128 U. S. 514, 520; *Lawrence Mfg. Co.* v. *Tennessee Mfg. Co.,* 138 U. S. 537, 546.

This essential element is the same in trade-mark cases as in cases of unfair competition unaccompanied with trade-mark infringement. In fact, the common law of trade-marks is but a part of the broader law of unfair competition. *Elgin Watch Co.* v. *Illinois Watch Co.,* 179 U. S. 665, 674; *G. & C. Merriam Co.* v. *Saalfield,* 198 Fed. Rep. 369, 372; *Cohen* v. *Nagle,* 190 Massachusetts, 4, 8, 15; 5 A. & E. Ann. Cas. 553, 555, 558.

Common-law trade-marks, and the right to their exclusive use, are of course to be classed among property rights, *Trade-mark Cases,* 100 U. S. 82, 92, 93; but only in the sense that a man's right to the continued enjoyment of his trade reputation and the good-will that flows from it, free from unwarranted interference by others, is a property right, for the protection of which a trade-mark is an instrumentality. As was said in the same case (p. 94), the right grows out of use, not mere adoption. In the English courts it often has been said that there is no property whatever in a trade-mark, as such. *Per* Ld. Langdale, M. R., in *Perry* v. *Truefitt,* 6 Beav. 73; *per* Vice Chancellor Sir Wm. Page Wood (afterwards Ld. Hatherly), in *Collins Co.* v. *Brown,* 3 Kay & J. 423, 426; 3 Jur. N. S. 930; *per* Ld. Herschell in *Reddaway* v. *Banham,* A. C. 1896, 199, 209. But since in the same cases the courts recognized the right of the party to the exclusive use of marks adopted to indicate goods of his manufacture, upon the ground that "A man is not to sell his own goods under the pretense that they are the goods of another man; he cannot be permitted to practise such a deception, nor to use the means which contribute to that end. He cannot therefore be

allowed to use names, marks, letters, or other *indicia*, by which he may induce purchasers to believe, that the goods which he is selling are the manufacture of another person" (6 Beav. 73); it is plain that in denying the right of property in a trade-mark it was intended only to deny such property right except as appurtenant to an established business or trade in connection with which the mark is used. This is evident from the expressions used in these and other English cases. Thus, in *Ainsworth v. Walmsley,* L. R. 1 Eq. Cas. 518, 524, Vice Chancellor Sir Wm. Page Wood said: "This court has taken upon itself to protect a man in the use of a certain trade-mark as applied to a particular description of article. He has no property in that mark *per se,* any more than in any other fanciful denomination he may assume for his own private use, otherwise than with reference to his trade. If he does not carry on a trade in iron, but carries on a trade in linen, and stamps a lion on his linen, another person may stamp a lion on iron; but when he has appropriated a mark to a particular species of goods, and caused his goods to circulate with this mark upon them, the court has said that no one shall be at liberty to defraud that man by using that mark, and passing off goods of his manufacture as being the goods of the owner of that mark."

In short, the trade-mark is treated as merely a protection for the good-will, and not the subject of property except in connection with an existing business. The same rule prevails generally in this country, and is recognized in the decisions of this court already cited. See also *Apollinaris Co. v. Scherer,* 27 Fed. Rep. 18, 20; *Levy v. Waitt,* 61 Fed. Rep. 1008, 1011; *Macmahan Co. v. Denver Mfg. Co.,* 113 Fed. Rep. 468, 471, 475; *Congress Spring Co. v. High Rock Congress Spring Co.,* 57 Barb. 526, 551; *Weston v. Ketcham,* 51 How. Pr. 455, 456; *Candee v. Deere,* 54 Illinois, 439, 457; *Avery & Sons v. Meikle,* 81 Kentucky, 73, 86.

Expressions are found in many of the cases to the effect
that the exclusive right to the use of a trade-mark is
founded on priority of appropriation.    Thus, in *Canal Co.
v. Clark*, 13 Wall. 311, 323, reference is made to "the first
appropriator"; in *McLean v. Fleming*, 96 U. S. 245, 251,
to "the person who first adopted the stamp"; in *Manufac-
turing Co. v. Trainer*, 101 U. S. 51, 53, the expression is
"any symbol or device, not previously appropriated,
which will distinguish," etc.    But these expressions are
to be understood in their application to the facts of the
cases decided.    In the ordinary case of parties competing
under the same mark in the same market, it is correct to
say that prior appropriation settles the question.    But
where two parties independently are employing the same
mark upon goods of the same class, but in separate markets
wholly remote the one from the other, the question of prior
appropriation is legally insignificant, unless at least it
appear that the second adopter has selected the mark
with some design inimical to the interests of the first user,
such as to take the benefit of the reputation of his goods,
to forestall the extension of his trade, or the like.

Of course, if the symbol or device is already in general
use, employed in such a manner that its adoption as an
index of source or origin would only produce confusion
and mislead the public, it is not susceptible of adoption as
a trade-mark.    Such a case was *Columbia Mill Co. v.
Alcorn*, 150 U. S. 460, 464, affirming 40 Fed. Rep. 676,
where it appeared that before complainant's adoption of
the disputed word as a brand for its flour the same word
was used for the like purpose by numerous mills in differ-
ent parts of the country.

That property in a trade-mark is not limited in its en-
joyment by territorial bounds, but may be asserted and
protected wherever the law affords a remedy for wrongs,
is true in a limited sense.    Into whatever markets the use
of a trade-mark has extended, or its meaning has become

known, there will the manufacturer or trader whose trade
is pirated by an infringing use, be entitled to protection
and redress. But this is not to say that the proprietor of a
trade-mark, good in the markets where it has been em-
ployed, can monopolize markets that his trade has never
reached and where the mark signifies not his goods but
those of another. We agree with the court below (208
Fed. Rep. 519) that "Since it is the trade, and not the
mark, that is to be protected, a trade-mark acknowl-
edges no territorial boundaries of municipalities or states
or nations, but extends to every market where the trader's
goods have become known and identified by his use of the
mark. But the mark, of itself, cannot travel to markets
where there is no article to wear the badge and no trader
to offer the article."

To say that a trade-mark right is not limited in its en-
joyment by territorial bounds, is inconsistent with saying
that it extends as far as the sovereignty in which it has
been enjoyed. If the territorial bounds of sovereignty
do not limit, how can they enlarge such a right? And if
the mere adoption and use of a trade-mark in a limited
market shall (without statute) create an exclusive owner-
ship of the mark throughout the bounds of the sovereignty,
the question at once arises, "What sovereignty?" So far
as the proofs disclose, the Allen & Wheeler mark has not
been used at all, is not known at all in a market sense,
within the sovereignty of Alabama, or the adjacent States,
where the controversy with the Hanover Star Milling
Company arose. And so far as the controversy concerns
intrastate distribution as distinguished from interstate
trade, the subject is not within the sovereign powers of
the United States. *Trade-Mark Cases*, 100 U. S. 82, 93.

We are referred to an expression contained in the
opinion of this court in *Kidd* v. *Johnson,* 100 U. S. 617,
619: "The right to use the trade-mark is not limited to
any place, city, or State, and, therefore, must be deemed

to extend everywhere." But a reference to the facts of the case, and the context, shows that, the language was not used in the sense attributed to it in the argument. The question presented for decision related to the ownership of a trade-mark used by complainants (Johnson & Co.) on packages and barrels containing whiskey, manufactured and sold by them in Cincinnati, and this turned in part upon the force to be given to a written transfer executed by one Pike and delivered to complainant's predecessors in business in connection with a sale of the distillery and its appurtenances, which were Pike's individual property. Kidd, the defendant, claimed the right to use the same mark as surviving partner of a firm of which Pike had been a member. The court, speaking by Mr. Justice Field, said (p. 619): "That transfer was plainly designed to confer whatever right Pike possessed. It, in terms, extends the use of the trade-mark to Mills, Johnson & Co. and their successors. Such use, to be of any value, must necessarily be exclusive. If others also could use it, the trade-mark would be of no service in distinguishing the whiskey of the manufacture in Cincinnati; and thus the company would lose all the benefit arising from the reputation the whiskey there manufactured had acquired in the market. The right to use the trade-mark is not limited to any place, city, or State, and, therefore, must be deemed to extend everywhere." This does not import that the trade-mark right assigned was greater in extent than the trade in which it was used. The record in the case showed that complainant's trade had been extended to New Orleans, and the controversy arose out of sales made there by defendants as licensees of Kidd. It was admitted in the answer that they had sold whiskey in competition with that of complainants at New Orleans, and under the same trademark, and the case was by stipulation treated as a test case to settle whether Johnson & Co. or Kidd had the

exclusive right, or whether they had a joint right, to the use of the mark.

We are also referred to *Derringer* v. *Plate*, 29 California, 292, 295, in which it was said by the court: "The manufacturer at Philadelphia who has adopted and uses a trademark, has the same right of property in it at New York or San Francisco that he has at his place of manufacture." In that case plaintiff averred that he was a resident of Philadelphia, and upwards of thirty years before the action invented a pistol and adopted as a trade-mark for it the words "Derringer, Philadel.," which was and ever since had been his trade-mark, and which he had caused to be stamped on the breech of all pistols manufactured and sold by him; and that the defendant since 1858 had been engaged in the manufacture of pistols at San Francisco similar to plaintiff's, on the breech of which he had stamped plaintiff's trade-mark, etc. The report of the case shows (p. 294) that the only question presented was whether the California statute of 1863 concerning trademarks had repealed or abrogated the remedies afforded by the common law in trade-mark cases. This was answered in the negative, and in the course of the reasoning the court said, p. 295: "The right is not limited in its enjoyment by territorial bounds, but, subject only to such statutory regulations as may be properly made concerning the use and enjoyment of other property, or the evidences of title to the same, the proprietor may assert and maintain his property right wherever the common law affords remedies for wrongs;" continuing with what we have first quoted. Although not expressly stated, it is implicit in the report that plaintiff's pistols were on the market in San Francisco, and his trade-mark known there and imitated by defendant for that very reason. It was such a mark as could not be accidentally hit upon.

It results from the general principles thus far discussed that trade-mark rights, like others that rest in user, may

be lost by abandonment, non-user, laches, or acquiescence. Abandonment, in the strict sense, rests upon an intent to abandon; and we have no purpose to qualify the authority of *Saxlehner* v. *Eisner*, 179 U. S. 19, 31, to that effect. As to laches and acquiescence, it has been repeatedly held, in cases where defendants acted fraudulently or with knowledge of plaintiffs' rights, that relief by injunction would be accorded although an accounting of profits should be denied. *McLean* v. *Fleming*, 96 U. S. 245, 257; *Menendez* v. *Holt*, 128 U. S. 514, 523; *Saxlehner* v. *Eisner*, 179 U. S. 19, 39. So much must be regarded as settled. But cases differ according to their circumstances, and neither of those cited is in point with the present. Allowing to the Allen & Wheeler firm and corporation the utmost that the proofs disclose in their favor, they have confined their use of the "Tea Rose" trade-mark to a limited territory, leaving the south-eastern States untouched. Even if they did not know—and it does not appear that they did know—that the Hanover Company was doing so, they must be held to have taken the risk that some innocent party might, during their forty years of inactivity, hit upon the same mark and expend money and effort in building up a trade in flour under it. If, during the long period that has elapsed since the last specified sale of Allen & Wheeler "Tea Rose"—this was "in the later 70's"—that flour has been sold in other parts of the United States, excluding the south-eastern States, no clearer evidence of abandonment by non-user of trade-mark rights in the latter field could reasonably be asked for. And when it appears, as it does, that the Hanover Company in good faith and without notice of the Allen & Wheeler mark has expended much money and effort in building up its trade in the south-eastern market, so that "Tea Rose" there means Hanover Company's flour and nothing else, the Allen & Wheeler Company is estopped to assert trade-mark infringement as to that territory.

The extent and character of that territory, and its remoteness from that in which the Allen & Wheeler mark is known, are circumstances to be considered. Alabama alone—to say nothing of the other States in question—has an area of over 50,000 square miles, and by the census of 1910 contained a population of more than 2,000,000. Its most northerly point is more than 250 miles south of Cincinnati, which is the nearest point at which sales of Allen & Wheeler "Tea Rose" are shown to have been made, and these at a time antedating by approximately forty years the commencement of the present controversy. We are not dealing with a case where the junior appropriator of a trade-mark is occupying territory that would probably be reached by the prior user in the natural expansion of his trade, and need pass no judgment upon such a case. Under the circumstances that are here presented, to permit the Allen & Wheeler Company to use the mark in Alabama, to the exclusion of the Hanover Company, would take the trade and goodwill of the latter company—built up at much expense and without notice of the former's rights—and confer it upon the former, to the complete perversion of the proper theory of trade-mark rights.

The case is peculiar in its facts; and we have found none precisely like it. The recent case of *Rectanus Co. v. United Drug Co.* (C. C. A. 6th), 227 Fed. Rep. 545, 549, 553, is closely analogous.

We come now to No. 23. The Court of Appeals (204 Fed. Rep. 211) denied relief to the Hanover Company against Metcalf under the head of trade-mark infringement partly upon the ground that Allen & Wheeler were the first appropriators of the mark, and that it had been continuously used by that firm and its successor down to the time of the suit, but principally upon the ground that, irrespective of whether this use was so general or continuous as to exclude other appropriation, the evidence

showed a use of the same brand by the Steeleville Company commencing in the year 1895 and carried on in the States of Illinois, Tennessee, Indiana, Arkansas and Mississippi, with occasional shipments into Alabama; a use so extensive and continuous as to exclude the claim of the Hanover Company to either first appropriation or exclusive use in any of the territory from which it sought to expel Metcalf; and that "the Steeleville Milling Company's first use and its extensive and continuous use established by the evidence in the territory of its selection gave it the unqualified right to extend unhampered its trade in flour under the Tea Rose brand into any part of the United States, and that too without incurring the legal odium of unfair competition." Relief under the head of unfair competition was denied upon the ground that the Hanover Company had not clearly shown that it had established by prior adoption the exclusive right to dress its goods in the manner claimed.

Upon the question of trade-mark rights as between the Hanover and the Steeleville companies (leaving Allen & Wheeler out of the question), the proofs are somewhat conflicting. There is evidence that Hanover's use of the Tea Rose brand antedated the year 1893, and probably began as early as 1886. The extent and particulars of such use, prior to the year 1903, are not made to appear. On the other hand, Steeleville appears to have adopted the brand in the year 1895, and used it in trade in Illinois, Tennessee, Mississippi, Louisiana, and Arkansas; the extent and particulars of the use not being shown. Sharp competition appears to have been carried on between the two companies in selling flour under the Tea Rose brand at Meridian, Mississippi, in the years 1903 to 1905, with the result that the Hanover Company, claiming that its use of the mark for flour had antedated that of the Steeleville Company, succeeded in obtaining a favorable decision in an informal arbitration by officials of the Millers

National Federation; and for this or some other reason
Steeleville appears to have retired and left the Hanover
Company in complete control of the Meridian market.
Aside from the business done by the Steeleville Company
at Meridian, there is no proof of business done by it in
the south-eastern States, except that it made an isolated
sale of Tea Rose flour to a merchant at Whistler, Ala-
bama, in the year 1899, the quantity not stated, and two
isolated sales, involving a small quantity in each case,
one to a retailer in Tupelo, Mississippi, in the year 1910,
the other to a retailer in West Point, Mississippi, in Jan-
uary, 1912.

As we regard the proofs, they do not sustain the view
of the Circuit Court of Appeals for the Fifth Circuit
either as to first use or as to extensive, continuous, or
exclusive use of the Tea Rose brand by the Steeleville
Company, and there is nothing in the history of the use of
the brand in the disputed territory to deprive the Hanover
Company of its right to be protected at least against
unfair competition at the hands of the Steeleville Company
or of Metcalf as its representative.

That there was such unfair competition, commenced
by Metcalf shortly before the bringing of the suit, the
proofs clearly show. Repeating that since the year 1904
the Hanover Company had extensively advertised its
Tea Rose flour throughout the State of Alabama and
parts of Mississippi, Georgia, and Florida, with the result
that its sales of that flour in those markets amounted
to more than $150,000 a year, while the Hanover Star
Milling Company had come to be known as the Tea
Rose mill, and the words "Tea Rose" in the flour trade
in that territory meant flour of the Hanover Company's
manufacture and nothing else, and that, except for isolated
sales in Mississippi in 1910 and 1912, already mentioned,
no Tea Rose flour other than that of the Hanover Com-
pany had been sold in that territory for a number of

years, it further should be stated that Hanover Tea Rose
was distributed in Butler County and adjoining counties
in Alabama by the McMullan Grocery Company, whose
place of business was at Greenville. They had built up
a large trade for this flour in Butler County and the neigh-
boring counties of Conecuh, Covington, Lowndes, and
Crenshaw. The McMullan Company had the exclusive
sale of the Hanover Company's Tea Rose flour, so that
Metcalf, who likewise did business at Greenville, was
unable to procure it for distribution to his customers.
A short time before the suit was commenced, however, he
announced to the public and the trade in Butler County
that he had secured Tea Rose flour, and on receiving a
consignment from the Steeleville Company, which was
labeled "Tea Rose" and put up in packages closely re-
sembling those used by the Hanover Company—so closely
that, according to the undisputed evidence, they are
"calculated to and do in fact deceive the ordinary and
casual purchaser of flour into the belief that he is pur-
chasing the article of that name manufactured by the
said Hanover Star Milling Company"—Metcalf put
large banners on his mules and dray advertising to the
public that he had received a shipment of Tea Rose flour,
and that it was "Steeleville Milling Company's Tea Rose
flour, best quality." Metcalf, and his traveling salesman
who marketed the greater part of this consignment, and
several parties who purchased it in lots of from one to ten
barrels, deposed that it was not sold under a representa-
tion that it was manufactured by the Hanover Company,
but, on the contrary, that it was Tea Rose flour manu-
factured by the Steeleville Milling Company. But Met-
calf's purpose to take advantage of the reputation of the
Hanover Company's Tea Rose flour is so manifest, and
the tendency of the similarity of the brand and accom-
panying design, and of the make-up of the packages, to
mislead ultimate consumers is so evident, that it seems to

us a case of unfair competition is made out. The circumstances strongly indicate a fraudulent intent to palm off the Steeleville Tea Rose flour upon customers as being the same as the Tea Rose flour made by complainant, the reputation of which is shown to be so well established. The mere substitution of "Steeleville" in the place of "Hanover" on the labels is not convincing either that the intent is innocent or that the result will be innocuous, since it is accompanied with the words "Tea Rose," (shown to have acquired a secondary meaning), and with the distinctive wrapping, both indicative in that market of complainant's flour. Complainant is thus shown to be entitled to an injunction against Metcalf, irrespective of its claim to affirmative trade-mark rights in that territory. *Coats* v. *Merrick Thread Co.*, 149 U. S. 562, 566; *Elgin Nat'l Watch Co.* v. *Illinois Watch Co.*, 179 U. S. 665, 674. Adjudication of the latter claim may be made, if necessary, upon final hearing, when the proofs will presumably be more complete than they now are.

It results that the decree under review in No. 23 should be reversed, and the cause remanded for further proceedings in accordance with this opinion, and that the decree in No. 30 should be affirmed.

*Decree in No. 23 reversed.*
*Appeal in No. 30 dismissed.*
*Decree in No. 30 affirmed.*

MR. JUSTICE HOLMES concurring.

I am disposed to agree that the decree dismissing the bill of the Hanover Star Milling Company should be reversed and that the decree denying a preliminary injunction to the Allen and Wheeler Company should be affirmed, and I agree in the main with the reasoning of the court, so far as it goes. But I think it necessary to go farther even on the assumption that we are dealing with

the question of trade-marks in the several States only so far as commerce among the States is not concerned. The question before us, on that assumption, is a question of state law, since the rights that we are considering are conferred by the sovereignty of the State in which they are acquired. This seems to be too obvious to need the citation of authority, but it is a necessary corollary of the *Trade Mark Cases*, 100 U. S. 82. Those cases decided that Congress cannot deal with trade-marks as used in commerce wholly between citizens of the same State. It follows that the States can deal with them, as in fact they sometimes do by statute, Mass. Rev. Laws, c. 72, §§ 2, 3, and when not by statute by their common law.

As the common law of the several States has the same origin for the most part and as their law concerning trade-marks and unfair competition is the same in its general features, it is natural and very generally correct to say that trade-marks acknowledge no territorial limits. But it never should be forgotten, and in this case it is important to remember, that when a trade-mark started in one State is recognized in another it is by the authority of a new sovereignty that gives its sanction to the right. The new sovereignty is not a passive figurehead. It creates the right within its jurisdiction, and what it creates it may condition, as by requiring the mark to be recorded, or it may deny. The question then is what is the common law of Alabama in cases like these. It appears to me that if a mark previously unknown in that State has been used and given a reputation there, the State well may say that those who have spent their money innocently in giving it its local value are not to be defeated by proof that others have used the mark earlier in another jurisdiction more or less remote. Until I am compelled to adopt a different view I shall assume that that is the common law of the State. It appears to me that the foundation of the right as stated by the court requires that conclusion. See

further *Chadwick* v. *Covell,* 151 Massachusetts, 190, 193, 194. Those who have used the mark within the State are those who will be defrauded if another can come in and reap the reward of their efforts on the strength of a use elsewhere over which Alabama has no control.

I think state lines, speaking always of matters outside the authority of Congress, are important in another way. I do not believe that a trade-mark established in Chicago could be used by a competitor in some other part of Illinois on the ground that it was not known there. I think that if it is good in one part of the State it is good in all. But when it seeks to pass state lines it may find itself limited by what has been done under the sanction of a power coördinate with that of Illinois and paramount over the territory concerned. If this view be adopted we get rid of all questions of penumbra, of shadowy marches where it is difficult to decide whether the business extends to them. We have sharp lines drawn upon the fundamental consideration of the jurisdiction originating the right. In most cases the change of jurisdiction will not be important because the new law will take up and apply the same principles as the old, but when, as here, justice to its own people requires a State to set a limit, it may do so, and this court cannot pronounce its action wrong.