## STAR CO. v. WHEELER SYNDICATE, Inc.

(Supreme Court, Special Term, New York County. August 14, 1916.)

1. TRADE-MARKS AND TRADE-NAMES ⬤═⇒21—ORIGINAL USER—RIGHTS OF PARTIES.

   The exclusive right to a trade-mark does not belong to the one who suggested or invented it, but to him who was the first to appropriate and use it in his business and to give it a name and reputation.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 24; Dec. Dig. ⬤═⇒21.]

2. TRADE-MARKS AND TRADE-NAMES ⬤═⇒30—RIGHT TO EXCLUSIVE USE—EMPLOYMENT OF OWNER.

   Where cartoonist entered the employ of plaintiff and so continued for a long period, plaintiff, being a newspaper publisher and operator of the syndicate, did not acquire as against the cartoonist, from the mere fact of his employment, the permanent exclusive right to the use of a title to the cartoons, the reputation therefor having been acquired before the cartoonist entered his employ, although plaintiff did have the exclusive right during the term of employment to the use of the name in connection with the cartoons.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 33, 34; Dec. Dig. ⬤═⇒30.]

3. TRADE-MARKS AND TRADE-NAMES ⬤═⇒24—PROPERTY SUBJECT—CARTOONS.

   Cartoons used in syndicated comic strips are to be treated as a commodity of barter and sale, the same as tangible goods or merchandise, which may be sold under a distinctive mark or name which the vendor may exclusively use as a trade-mark in their sale.

   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 27; Dec. Dig. ⬤═⇒24.]

Action by the Star Company against the Wheeler Syndicate, Incorporated. Decree for defendant.

See, also, 155 N. Y. Supp. 782.

William A. De Ford, of New York City (Bainbridge Colby, David Gerber, and Nathan Burkan, all of New York City, of counsel), for Star Co.

Charles E. Kelley, of New York City, for Wheeler Syndicate, Inc.

GREENBAUM, J. The controversy in this action has narrowed itself to the inquiry whether the plaintiff, the Star Company, has acquired a trade-mark in the words "Mutt and Jeff" as a title to a series of cartoons published in its paper known as the American. The controlling facts upon which the rights of the parties depend are practically undisputed. Harry C. Fisher, known by the nom de plume of "Bud Fisher," was concededly the creator of two grotesque figures which he named "Mutt and Jeff," respectively, and which he utilized in a series of cartoons, each publication being in the form of what in newspaper parlance is called a "comic strip." Each strip consisted of four or more pictures in which the chief characters "Mutt and Jeff" were delineated in various attitudes and situations and were represented as exchanging views on a variety of topics, the words of the dialogue being printed in a balloon-shaped scroll emanating from the lips of the speakers. Mr. Fisher began this series of cartoons on

November 15, 1907, in the San Francisco Chronicle with the character of "Mutt." Commencing on December 11, 1907, he continued the publication of these cartoons in the San Francisco Examiner until April 9, 1909. During this period, and as early as March and April, 1908, which was prior to the time he entered in plaintiff's employ, he introduced the figure "Jeff" in his comic strip, and the cartoons became known to the public as "Mutt and Jeff," although these words had not formally appeared in the headings of the pictures. He started on the Chronicle with a weekly salary of $15, which he shortly after increased to $27.50. When he entered into the employ of the Examiner his salary became $50 a week, subsequently increased to $60 and then to $75. In February, 1909, he made a three-year contract with the Examiner, which was owned or controlled by William R. Hearst, the virtual owner of the New York American and other newspapers. In May, 1909, he came to New York City and prepared daily cartoons for the American until August, 1910, when a new contract was made with the plaintiff for a term of five years at a salary of $200 a week for the first year, $250 during the second, third, and fourth years, and $300 a week during the fifth year. The contracts of February, 1909, and August, 1910, provided for Fisher's exclusive services at a weekly salary on "publications and newspaper enterprises in which William R. Hearst is or may be interested." One of these enterprises was and is known as the International News Service. During substantially the entire period of these contracts Fisher's cartoons appeared daily in the Hearst publications and in other publications under agreements made with the International News Service. The first time that the words "Mutt and Jeff" were employed in the caption of the cartoons was under date of November 20, 1909, as follows: "Mutt and Jeff do a Little Ticket Scalping at the Big Game—by 'Bud' Fisher." As a matter of fact Fisher himself prepared the titles of headings to the cartoons, and they were uniformly published as prepared by him until December 11, 1914, when the words "Mutt and Jeff" were printed for the first time as the heading of the Fisher comic strip, reading as follows: "Mutt and Jeff—The Little Fellow Also Knows Some Law and Proves it." This heading was published without the knowledge of Mr. Fisher, who promptly protested against its use, with the result that the succeeding publications contained only headings or titles as prepared by Fisher in accordance with previous practice. It may here be observed that at about this time ineffectual negotiations had been in progress for plaintiff's renewal of the Fisher contract, and in December, 1914, Mr. Fisher had concluded a contract with the Wheeler Syndicate to commence upon the expiration of the term of the subsisting agreement with plaintiff, and it was therein provided that he was to receive a minimum of $1,000 weekly for his "Mutt and Jeff" cartoons. On January 19, 1915, and down to the end of that month the American again published the Fisher cartoons with the title "Mutt and Jeff—by 'Bud' Fisher." When these titles appeared Mr. Fisher again protested against their use, and upon the plaintiff's failure to discontinue them he ceased furnishing any further drawings for the plaintiff. It may further be

noticed that the plaintiff at times during the term of its contract with Fisher extensively advertised that "Mutt and Jeff will appear in the New York American daily." These advertisements were printed in its Sunday editions, and also on cards in subway and elevated stations, on billboards, news stands, and upon plaintiff's newspaper delivery wagons.

[1, 2] Broadly stated, the contention of the plaintiff is that, being the first one to use the title "Mutt and Jeff" in connection with its comic series, it is entitled to the exclusive right to the use of such title as a trade-mark or trade-name. It doubtless is the law that the exclusive right to a trade-mark does not belong to the one who suggested or invented it, but to the party who was the first to appropriate and use it in his business and give it a name and reputation. Caswell v. Hazard, 121 N. Y. 494, 24 N. E. 707, 18 Am. St. Rep. 833; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 463, 14 Sup. Ct. 151, 37 L. Ed. 1144; 28 Am. & Eng. Enc. of Law (2d Ed.) pp. 393, 394. The plaintiff insists that the facts of this case bring it within the decision in Herald Co. v. Star Co. (C. C.) 146 Fed. 204, affirmed by Circuit Court of Appeals, 146 Fed. 1023, 76 C. C. A. 678, and Outcalt v. N. Y. Herald (C. C.) 146 Fed. 205. Popularly known as the "Buster Brown" case. While the facts in the "Buster Brown" case are quite analogous in some features to those here appearing, yet they may be differentiated in material respects. In the "Buster Brown" case the court found as a fact that the New York Herald was the first to use the words "Buster Brown" as the "title of a comic section" of its newspaper. In the case at bar the plaintiff had published the cartoons for about five years without the title of "Mutt and Jeff," and the only titles employed were those prepared by Fisher, which varied from day to day; the captions being appropriate to the subject-matter of the given strip. In the "Buster Brown" case it appeared that the New York Herald had used the title for a number of years as a heading to a comic section of its paper. In the case at bar no such situation existed. Under all the circumstances here appearing it may not be fairly held that the plaintiff had actually used "Mutt and Jeff" as a title of Fisher's comic strips, even if it be assumed that a strip may be regarded as a comic section of the paper. The fact is that during the entire period of its contract with Mr. Fisher plaintiff published these strips without any title of its own. The mere circumstance that in its advertisements the cartoons were referred to in connection with the words "Mutt and Jeff" is of no special significance, since it is also the fact that since September 22, 1910, Fisher published upwards of 300,000 copies of his books of cartoons selected from those which had appeared in the American under the title of "The Mutt and Jeff Cartoons by Bud Fisher." It is thus evident that the plaintiff was not the first user of the words "Mutt and Jeff" as a title or trade-mark, and that these words had not been appropriated by it as a trade-mark or trade-name to designate its comic section or a portion thereof, except upon the few occasions during the expiring months of the agreements, after the plaintiff realized that a renewal of the Fisher contract was out of the question. It is clear that this is not a case

where the plaintiff had been in the habit of labeling its comic strips with a distinctive mark, or where it may be fairly said that it had acquired by user the words "Mutt and Jeff" as against Fisher. Nor is this a case where it may be held that the plaintiff, being entitled to the exclusive services of Fisher in the drawing of the cartoons in question, became entitled to the use of the title "Mutt and Jeff," since these words originated with Fisher before he entered in the employ of plaintiff, and the cartoons had already acquired a reputation as "Mutt and Jeff" cartoons. The facts in this case, too, are different from those appearing in Jaeger's Co. v. Le Boutillier, 47 Hun, 521, where it was shown that Prof. Jaeger had never been engaged in the business of selling goods, and therefore had never acquired any proprietary right in a trade-mark. On the other hand, the facts established in this case are that Fisher was most actively engaged for some time prior to his employment with plaintiff in producing the cartoons with "Mutt and Jeff" characters.

[3] These cartoons, in effect the products of Fisher's hand and brain, are to be treated as a commodity of barter and sale, the same as tangible goods or merchandise which may be sold under a distinctive mark or name which the vendor may exclusively use as a trade-mark or trade-name in the sale of such goods. The mere circumstance that for a period of time Fisher obligated himself to produce his cartoons exclusively for the plaintiff no more deprived him of the exclusive right to use the trade-mark or trade-name of his productions than would a manufacturer of goods known by a trade-name be deprived of the exclusive right to such trade-name, because he had agreed for a definite time, to manufacture them exclusively for a given firm. Of course, during the time when Fisher was obliged to furnish his cartoons exclusively to the plaintiff, the latter had the exclusive right to the use of the trade-name which went with the exclusive right to all of Fisher's output; but when the contract terminated Fisher was at liberty to sell this output to whomsoever he wished. The law of the case is so well considered in Hanover Milling Co. v. Metcalf, 240 U. S. 403, 36 Sup. Ct. 357, 60 L. Ed. 713, et seq., that citation of further authorities would be superfluous. In the opinion of the court the plaintiff is not entitled to the use of the trade-name or trade-mark "Mutt and Jeff," the right thereto being now vested in the Wheeler Syndicate under its subsisting contract with Fisher, subject to such rights, if any, reserved therein to Fisher.

There must be a decree in favor of defendant.