### ROSENBERG BROS. & CO. v. ELLIOTT.

(District Court, E. D. Pennsylvania. January 24, 1925.)

No. 3117.

1. **Trade-marks and trade-names and unfair competition** ⬀61—**Trade-mark for ready-made clothing held not infringed by use of same trade-mark for hats.**

Complainants' trade-mark for ready-made clothing, which it manufactures, and which includes only outer garments, such as overcoats, coats, vests, and trousers, held not infringed by the use by defendant of the same trade-mark for hats, which are in a different line of trade.

2. **Trade-marks and trade-names and unfair competition** ⬀61—**Exclusive right to mark is limited to trade in which it is used, or the same line of trade.**

The owner of a trade-mark has a property right in it only in relation to the trade in which he uses it, and is entitled to exclude others from its use only in that trade, or in a trade so closely related to it that it is found to be the same line of trade.

In Equity. Suit by Rosenberg Brothers & Co. against John F. Elliott. Sur trial hearing on bill, answer, and proofs. Decree for defendant.

Cox, Kent & Campbell and Clarence G. Campbell, all of New York City, and Cyrus N. Anderson, of Philadelphia, Pa., for plaintiff.

Andrew Foulds, Jr., of New York City, and John S. Freemann, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. The cause of action here, if there is one, is based upon the averment of a trespass upon the trade-mark rights of the plaintiff. The real question presented is one of some interest in itself, and is one the answer to which doubtless affects quite a number of the users of trade-marks.

The plaintiff is a manufacturer of what is known as "ready-made clothing." The descriptive features of this name or phrase are always understood to include (and this is in accord with the fact here) only what is sometimes called "outer" clothing, and to be exclusive of hats, collars, cuffs, shirts, underwear, socks, and the like. The trade of the plaintiff is further strictly a wholesale trade.

The defendant, on the other hand, is a dealer selling only at retail and (so far at least as affects the averred cause of action) does not sell the line of "goods" which the plaintiff manufactures. The real point on which the controversy pivots may be best presented by the following fact statement:

The plaintiff owns and uses a trade-mark, which is also registered in the following forms:

"Fashion Park Clothes."

"Fashion Park."

"Tailored at Fashion Park."

The only use which the plaintiff made of the trade-mark, and the only use which plaintiff had for it, was to mark or identify as its make overcoats, coats, vests, trousers, and the like kind of clothing manufactured by it. It was never used to mark or identify hats, nor did the plaintiff make hats.

The defendant, on the other hand, sold hats, and sold them with the name of "Fashion Park" on the lining, and advertised them by cards as "Fashion Park Hats." He did not sell the line of clothing which plaintiff manufactured. The manufacturer of the hats which he did sell made application to register a trade-mark like that of plaintiff. The ultimate Patent Office finding was a refusal of the right to a registered trade-mark. An appeal has been taken or is impending to have this ruling reviewed as provided by law.

[1] The real question is the extent or scope of the property right in a trade-mark. Does the exclusive right which the trade-mark owner has extend to any use of it, or is it limited to the same kind of use which he makes of it? Directed to the fact situation here presented, the specific question is (assuming the use of the trade-mark on clothing would be a trespass upon plaintiff's trade-mark rights) whether marking hats in the same way would be a like trespass? We have mentioned the fact of a pending effort to have a trade-mark registered by the hat manufacturer.

The question thus presented is a quite different question from that here presented. The industry of counsel has brought to light a number of instances of the use of like trade-marks to identify manufactured products of a different kind or class. An analogous instance is that of the Stetson hat and Stetson clothes or shoes. It can be readily understood that one who has by merit or wide publicity made a good name for himself, or for that in which he deals, would resent the use of that name by another merely because it has advertising value. The feeling is not merely one of wounded vanity, but is that the second user has appropriated to his own selfish purposes that which has cost the first user good money, and to which the second has no claim of right. The real question is, however, whether there is in this any legal injury. If the first user has a property right in the name itself, the legal injury is clear. If, however, his sole right is one of protection to his trade in that in which he deals, and there is no injury to that trade, it is difficult to grasp the thought of a legal injury.

The purchasing public may have confidence in a particular dealer, or think the things in which he deals to excel in quality, and yet not have the knowledge to enable them to tell upon mere inspection what are the "goods" of that dealer. It is helpful, in consequence, to put upon them a sign manual. There is in the trade-mark law a policy of the law to protect the public as well as to recognize a right of property in the dealer. A trade-mark is thus a mark or symbol of origin, or of the source of supply of things in which one has a trade. It serves to identify and make known that which he has for sale, and which may be in demand because it emanates from him. It is a protection or guard against unfair competition. To such protection the owner of

the trade-mark has a claim of right. Beyond this, however, the legal right does not extend. He has no exclusive right to engage in trade in any particular line of goods, nor by his trade-mark alone does he have the exclusive right to trade in any particular kind or style of goods. He has likewise no ownership in or exclusive right to use any mark or symbol, unless its use by others may cause their goods to be mistaken for his. The line which marks the end of the danger of such a substitution marks the limits of his right.

Whenever one, at great expense to himself, creates a value for a name or a mark, he resents, as we have said, its appropriation and use by another. If any one has a property right in such mark, it is the one who was the creator of the value. The real question is whether any one has such property right. Assuming the manufacturer of an automobile to have a valid registered trade-mark in the mark or label "Packard Six," if any unauthorized person sold another make of automobile under that name, there would be no hesitation in making the finding of a violation of the trade-mark right. If, however, the sale was not of an automobile, but of a toy car, would this be a trespass upon the rights of the owner of the trade-mark? Doubtless the maker of the automobile would think the toy car to be a fairly good advertisement of his automobile, and not complain nor think any damage done to his trade. We are speaking, however, of the legal injury, not of the quantum of the damage. Would there be any legal injury? The maker of a watch, which was sold under the trade-name of the X watch, and who had given a high reputation to his watches sold under that name, might resent it as an encroachment if a manufacturer put out an automobile under the same name of X, and adopted as a trade slogan that his automobile was "built like a watch," or, more especially, "like an X watch." If the automobile was mechanically well built, the watch manufacturer might feel that his watch had been complimented. If the automobile was a poor job, its maker might be guilty of what was in a sense a trade slander upon the watch.

In what view, however, could the use of the name X for an automobile be considered an infringement of a watch trade-mark? Wherein would be the danger of any purchaser mistaking an automobile for a watch? By the same token, who would mistake a hat for an overcoat? The true view would seem to be that one dealer has as much right to the use of X as a trade-mark as another.

Whether it is good policy to permit one person to register a trade-mark used by another, although to mark a different line of "goods," is a wholly different question from that before us. The first user, however, cannot appropriate it, so as to confer upon himself the right to its sole or exclusive use. He has the right of appropriation, but it is sub modo only, and is limited and restricted to his use of it as a "mark" to designate that in which he deals, so that nothing else can be palmed off as his upon those who would otherwise buy that in which he dealt.

The experienced and very capable counsel for plaintiff do not combat this view, but assert that the right of protection extends all along the line of the things in which the trade-mark owner deals, or in which he may deal, because included within the same general class as the specific things in which he now deals. The general class here is known as men's apparel, or the things which men wear. Hats are not overcoats, but both are alike worn by men. This would seem to bring the question to one of classification. It is, however, a trade classification. The correct fact finding, we think, is that, although in the trade one store may carry everything in men's wear, from shoes to hats, and from undershirts to overcoats, the trade classification pronounces that the storekeeper who does this deals in several lines, one of which is ready-made clothing and another hats. The test is whether a particular thing belongs to one line or another. It cannot be whether it belongs to any one of any number of different lines, which any one store or many different stores may carry, because, if so, the country crossroads general store and its evolutionary successor and direct descendant, the city department store, would make all things which are sold all belong to one class. The final question thus becomes whether the common practices and usages of trade classify hats and overcoats as in the same or different lines of trade. Our finding is that they are different lines.

There is one case (among many) to which we have been referred as a guide to aid us in drawing the called-for line. Aunt Jemima v. Rigney, 247 F. 407, 159 C. C. A. 461, L. R. A. 1918C, 1039. This, which may be known as the Aunt Jemima Case, is very much sui generis. The trade-mark was of the words "Aunt Jemima's," in conjunction with a very characteristic pictorial representation of the type of negress cook, commonly called "Aunty," with a face expressive of jollity and overflowing good nature. The defendants in that case made use of a

trade-mark which the court found to be "precisely like the complainants." The observation was there made by the court that the difference between the right to a trade-mark and the right to an established trade identified by that mark may become "a mere question of words," as it was in effect held to be in that case, yet we think it is likewise true that the distinction goes to the very vitals of the instant case. It can be readily recognized that this pictorial representation of what is really the popular ideal of a "colored aunty cook" was one which might be made the subject of a copyright. Had it been so copyrighted, the "precisely like" pictorial representation put out by the defendants in that case might well have been held to be an infringement of the copyright. This is, however, to mistake a trade-mark right for a copyright right. The court in the case under consideration took the view, and expressed the thought upon which the ruling made was based, that "goods, though different, may be so related as to fall within the mischief which equity should prevent." This, of course, leaves open the question of what is "the mischief which equity should prevent"?

We read this case as ruled upon the fact finding that the same trade-mark was used in the same "line of trade," because they were so closely related that what would be an injury to one is an injury to the other. It is true that the finding is buttressed with other observations. One is that the use of the same trade-mark was likely to induce users of the syrup and of the flour to think they both came from the there complainant. Another is that the trade reputation of the complainants is thus put into the hands of the defendants. Still another is that the defendants thus reaped a benefit from the reputation and advertising outlays of the complainants.

[2] All these comments are justified, but the immediate reference to the case of Florence v. Dowd, 178 F. 73, 101 C. C. A. 565, shows clearly the limitation of the bearing of these observations. It is that two lines of trade may be so related as that for trade-mark purposes they may be deemed to be the same. We do not read the case to rule that a trade-mark owner has a property right in a trade-mark as such, wholly independent of and unrelated to the trade in which he uses it. It is true that the use of a trade-mark in a wholly unrelated trade may be resented by its owner, whose reputation and advertising outlays have given it a value in any trade. It is likewise true that the second user is reaping a benefit from the

reputation and at the cost of the owner of the trade-mark without himself having contributed anything to the value of that the use of which he has appropriated. The resentment of the owner against such use is a natural one. The real question, however, as already stated, is whether such use is a legal injuria. The distinction and difference, as well between the case under consideration and the instant case, lies in the fact finding made in the one case that the infringing use was in a related, and because of this in the same, line of trade; in the instant case, the finding we have made is that the charged infringing use was in a wholly different line of trade. Because the Aunt Jemima Case was thus based upon a fact finding, no importance is to be attached to the refusal of a certiorari by the Supreme Court.

That the conclusions reached and already stated with respect to the nature and extent of a trade-mark right are in accord with the accepted doctrines of the law, and that the right is restricted to the trade to which it applies, or to a trade so closely related to it that it is found to be the same line of trade, is shown by the adjudged cases, among which are McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828; Hanover v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713; Touraine v. Washburn, 52 App. D. C. 356, 286 F. 1020; Imperial v. Fairbanks, 50 App. D. C. 250, 270 F. 686; Hercules v. Newton (C. C. A.) 266 F. 174; Borden v. Borden (C. C. A.) 201 F. 510.

There are a number of cases in which it was held that the infringing use was in a line of trade so closely related to that of the trade-mark use as that the former should be enjoined. Florence v. Dowd, 178 F. 73, 101 C. C. A. 565; Anheuser v. Budweiser (D. C.) 287 F. 243; Ruppert v. Knickerbocker (D. C.) 295 F. 381; Wrightington v. Ward (D. C.) 288 F. 601.

The things in which the opposing dealers trade and to one of which the trade-mark relates may answer to the same description and be adapted to the same use. Here infringement of a trade-mark right may be found. Morgan v. Alfocorn (D. C.) 270 F. 344.

As already stated, cases of the refusal to register a trade-mark which might be confused with one previously registered raise a wholly different question. A leading case is Waltke v. Schafer, 49 App. D. C. 254, 263 F. 650.

A decree dismissing plaintiff's bill for want of equity, with costs to defendant, may be submitted.