ROBERT N. BREWER *et al.*, Plaintiffs and Counterdefendants-Appellees and Cross-Appellants, *v.* EGYPTIAN SPORTS, INC., Defendant and Counterplaintiff-Appellant and Cross-Appellee.

Fifth District    No. 5—83—0132

Opinion filed February 24, 1984.

John Womick, of Carbondale, for appellant.

Feirich, Schoen, Mager, Green & Associates, of Carbondale, for appellees.

PRESIDING JUSTICE WELCH delivered the opinion of the court:

The issue in this case is who is entitled to use the name "Prime Time Restaurant * Lounge" in Carbondale. The trial court held that the owner of a restaurant of that name in Mt. Vernon should be protected against use of a similar name by the operator of a restaurant in a sports complex in Carbondale. We agree with that conclusion.

Plaintiff Robert Brewer is the president and majority shareholder of plaintiff America's Best Inns, Inc. That corporation owns motels in East Peoria, Bloomington, Champaign, Mt. Vernon and Marion, Illinois. Some of these have restaurants associated with them, and the motels are advertised under the name "Best Inns of America."

In 1979, Brewer bought an existing restaurant building on land close to the "Best Inns" motel in Mt. Vernon. The restaurant and motel are located near the intersection of interstate highways 64 and 57. Work began to remodel the existing building in late 1979, and in June 1980, Brewer commenced restaurant operations under the name "Prime Time, Restaurant * Lounge." This restaurant has been described as a steakhouse, a full service restaurant and a supper club. It has a dress code, which is "rather loosely defined," it does not serve breakfast, and it often features live entertainment.

Soon after the "Prime Time" restaurant opened in Mt. Vernon, Brewer began to advertise it. In addition to placing advertisements in the Mt. Vernon media, Brewer advertised the restaurant on WSIL-TV, which reaches Carbondale, and in the Southern Illinoisan, a newspaper published in that city. Carbondale is located approximately 60 miles from Mt. Vernon, and the two cities are connected by four-lane highways. Brewer discontinued the television and Southern Illinoisan advertisements shortly after starting them.

In the fall of 1981, Brewer planned to expand his business to Carbondale by building a restaurant and motel on land which he had purchased there in 1979. Brewer contracted for architectural and devel-

opment services for the Carbondale project, and in March 1982, he applied to the city of Carbondale for industrial revenue bonds to help finance it. That application was approved by the city. Articles appeared in the Southern Illinoisan on the proposed restaurant and motel in May, June, September and October, 1982. Construction of the project began in October of that year.

Gregory Eversden is the president and one-half owner of defendant Egyptian Sports, Inc. (Egyptian). He operates restaurants in Collinsville, Wood River, Godfrey, Carbondale, Harrisburg and Quincy, Illinois. In September 1980, he took over the operation of a bowling alley called the "Carbondale Bowl." Eversden experienced some difficulties with the lessor of the bowling alley, and in January 1981, he started to plan for a new sports center. In June 1982, he acquired a building which contained several tennis courts.

Eversden intended to convert that property into a recreational center which would feature bowling, tennis, racquetball, weight lifting and a restaurant. Remodeling of the building began in July 1982, and Egyptian was incorporated the following month. Also in August, according to Eversden, he announced to members of bowling leagues to be transferred to the new Egyptian Sports Center from the Carbondale Bowl that the restaurant in the Center would be called "Prime Time." Eversden testified at trial that he ordered the printing of menus with that name on them in September 1982. In rebuttal, the plaintiffs offered the testimony of printer Richard Kramerich. He stated that his publishing firm received an order in September 1982 from someone affiliated with Egyptian, and that order was for menus to be printed with the name "King Tut's" on them. Kramerich explained that no such menus were ever printed, but in November 1982, his firm received an order from Egyptian to print menus with the name "Prime Time" on them.

At trial, Eversden listed his reasons for selecting the name "Prime Time" for the restaurant in the Egyptian Sports Center. First, there is a bowling organization established by the National Bowling Council for senior citizens, the "Prime Timers," and Eversden indicated that this demographic group is the fastest growing population of potential bowlers. Second, the Egyptian Sports Center features different rates for "prime time" and "non-prime time" tennis and racquetball. Finally, all the other restaurants operated by Eversden have names which begin with the letter "p," such as "Papa K's," "Periwinkles," and "Puzzles."

Egyptian applied for a liquor license for its restaurant in August 1982, and Eversden planned to open the restaurant and bowling alley

later that month. In fact, the bowling alley was not opened until September, and the liquor license was not issued until September 29. The restaurant was certified by the Jackson County health department on November 29, 1982, and it began service shortly thereafter. On December 3, the restaurant was first advertised in the local media under the name "Prime Time, Restaurant and Lounge." This litigation commenced with the filing of the plaintiffs' complaint for injunctive relief in the circuit court of Jackson County on December 9.

The plaintiffs never registered the name "Prime Time, Restaurant * Lounge" as a service mark in Illinois, although an application for Federal registration was pending at the time of trial in this case. Egyptian filed two applications for Illinois registration of the name. The first of these was prepared on September 24, 1982, but was never filed. The second application was prepared on November 9, 1982, and a certificate of registration was issued by the Secretary of State the following day. Between the preparation of the first and second applications, Eversden was visited at the Sports Center by counsel for the plaintiffs. As they discussed fitness equipment and the other facilities at the center, plaintiffs' counsel learned that Eversden intended to call his restaurant "Prime Time." Plaintiffs' counsel then informed Eversden that his clients were also planning to open a restaurant by that name in Carbondale.

The restaurant operated by the defendant differs from those run by the plaintiffs in some respects. There is no dress code for the restaurant in the sports complex, and indeed many patrons come dressed in exercise garb. Live entertainment is not featured. Nonetheless, the Egyptian Sports Center is located one-half mile from the plaintiffs' new motel and restaurant facilities. Brewer testified in January 1983 that he intended to open his Carbondale restaurant in April 1983. Plaintiffs' brief indicates that the restaurant opened in June of that year.

In the form that it existed at the time of trial, the plaintiffs' complaint included requests for three types of relief. They sought an injunction to prevent the defendant from using the name "Prime Time, Restaurant and Lounge" in the State of Illinois, cancellation of the defendant's Illinois registration of that name and an award of reasonable attorney fees and damages. Egyptian filed a counterclaim for an injunction against the plaintiffs and for attorney fees. Following a bench trial, the court entered judgment memorialized in a thoughtful memorandum. It enjoined the defendant from operating a restaurant and lounge under the name "Prime Time, Restaurant and Lounge," or similar appellation, within the circulation area of the Southern Illi-

noisan as it existed on May 25, 1982. Egyptian's counterclaim was denied, as were the request to cancel Egyptian's service mark registration and all requests for costs and attorney fees.

Egyptian appeals from this order and argues that although the plaintiffs are entitled to protection of their trade name in the Mt. Vernon area, that protection should not extend to Carbondale. The plaintiffs have filed a cross-appeal in which they assert that the court should have cancelled Egyptian's registration of its service name and awarded them attorney fees and damages.

The principles which guide us in our decision are those of the common law of trademarks. Under those rules, the plaintiffs, as the first users of the name "Prime Time, Restaurant * Lounge," must be afforded some protection against use of that name, or a similar one. (*Hanover Star Milling Co. v. Metcalf* (1916), 240 U.S. 403, 60 L. Ed. 713, 36 S. Ct. 357.) The question which follows from that statement is how far should that protection extend.

Egyptian argues that the trial court erred in finding the plaintiffs' "zone of protection" to include Carbondale. In support of this contention, Egyptian points to the trial testimony of three professors of marketing at Southern Illinois University, Dr. Don Perry, Dr. John Summey and Dr. Charles Hendersman. The professors defined the term "market area" for a particular business as the region from which that business draws the "vast majority," usually between 80 and 90%, of its customers.

Dr. Perry conducted several marketing studies to determine the market areas for the Mt. Vernon "Prime Time" restaurant and Egyptian's "Prime Time" restaurant. Those studies included a telephone survey of residents in the Carbondale and Murphysboro areas, an analysis of questionnaires distributed at two locations in Carbondale, and a study of the registration addresses of license plates on vehicles observed parked in the lot of the Mt. Vernon restaurant. Based upon these efforts, Perry ascertained the market area for Egyptian's restaurant as the region within a 15-mile radius of Carbondale. He concluded that none of this territory was located within the market area of the Mt. Vernon restaurant. Dr. Summey and Dr. Hendersman did not direct any studies of their own, but both men agreed with the conclusions of Dr. Perry.

Egyptian argues that since the market areas of its restaurant and the Mt. Vernon restaurant do not overlap, the plaintiffs' mark should not be protected in Carbondale. Essentially, they urge that the trial court erred in failing to define the zone of protection of a restaurant as synonymous with its market area. However, we agree with the

plaintiffs that under widely accepted principles of trademark law, that definition of a mark's protected zone is overly restrictive.

■ Drawing the boundaries of a zone of protection for a trade or service mark is difficult to do with precision. Earlier authorities have stated that a user of a mark may only be protected in the area in which he does business. More recent decisions and commentators, recognizing the role of the mass media in enlarging commercial markets, have generally used three concepts which, considered together, define the protected zone. The first of these is the actual market of the prior user of the mark. The second is the reach of the user's advertising and reputation, and the third is the area to which the user can reasonably be expected to expand his trade. (See *Wiener King, Inc. v. Wiener King Corp.* (D.N.J. 1976), 407 F. Supp. 1274; Comment, *The Scope of Territorial Protection of Trademarks*, 65 Nw. U.L. Rev. 781 (1970); Annot., 148 A.L.R. 12 (1944).) These concepts look to the nature and extent of the prior user's business. Some authorities have found the intentions of the subsequent user a relevant inquiry. We need not decide whether this position is correct, for an analysis of the plaintiffs' business shows that Carbondale is in the zone of protection of the "Prime Time" restaurant name.

■ The first of the component areas is that of the plaintiffs' actual market. The courts have found several factors significant in defining the market area for a restaurant. Among these are whether the restaurant is located in an urban or rural setting, whether it is easily accessible by car, and whether it is a dining establishment or a snack stand. Consideration of factors such as these is a judicial attempt to approximate the region from which the restaurant draws its customers. This inquiry is more precisely accomplished, however, by the use of the statistical market research techniques employed by the expert witnesses in this case. Their definition of the market area of a restaurant as that territory from which it draws the vast majority of its patrons provides a more accurate assessment of that market than we could give through a descriptive analysis of the restaurant. Thus, despite certain methodologial limitations to some of the research proffered by Egyptian, we accept the market area defined by that research as roughly the actual market of the Mt. Vernon restaurant. That market does not include Carbondale.

The second component area is the plaintiffs' advertising and reputation zones. This region consists of that territory into which the plaintiffs have sought to solicit business, or into which knowledge of the restaurant has spread, with or without assistance from the plaintiffs. There must certainly be a requirement of significance to that

reputation or the penetration of the advertising. For example, the Mt. Vernon "Prime Time" restaurant is located near the interstate highway which connects Chicago and New Orleans. It could not be argued that the patronage of travelers from New Orleans several times a year would extend the protection of the "Prime Time" name to that city. Nor would advertising in that city do so, absent a showing that that advertising was reflected in some public awareness and patronage of the restaurant by its residents.

Under these principles, one could contend that Carbondale lies within the advertising and reputation zone of the Mt. Vernon restaurant. The plaintiffs did advertise in the Carbondale media market, albeit several years ago, and several witnesses at trial indicated that the Mt. Vernon restaurant was known in that city, although no studies were presented to quantify the extent of its name recognition. Perhaps it is best to describe Carbondale as at the outer edges of the Mt. Vernon restaurant's area of advertising and reputation. But, we need not rely upon this factor alone in upholding the trial court's decision.

The third component area is that of the prior user's territory for reasonable expansion. Here, the court must ask what steps have been taken by the user to expand his business. Typically, the prior user is, at most, only considering new facilities when confronted with another user of his mark. (Compare *Burger King of Florida, Inc. v. Hoots* (7th Cir. 1968), 403 F.2d 904.) In this case, the plaintiffs purchased land, contracted for architectural and developmental services, received authorization for industrial revenue bonds and actually began construction of their new restaurant, all before Egyptian opened its restaurant. A Carbondale "Prime Time" restaurant operated by the plaintiffs was not merely a speculative venture when Egyptian's restaurant opened its doors, but was instead a partially completed business entity. As such, it is entitled to protection against a business of a virtually identical name in Carbondale, especially given that Carbondale is located within the advertising and reputation zones of the Mt. Vernon restaurant. Inasmuch as Egyptian's restaurant is in the zone of protection of the plaintiffs' mark, and as its operation is likely to cause confusion among restaurant patrons in that territory, we must affirm the injunctive relief granted by the trial court.

In their cross-appeal, the plaintiffs request us to order that Egyptian's registration of the service mark "Prime Time Restaurant & Lounge" be cancelled. Under section 9(A)(4)(c) of "An Act to provide for the registration and protection of trade-marks, service marks and trade-names ***" (Ill. Rev. Stat. 1981, ch. 140, par. 16(A)(4)(c)), the Secretary of State must cancel the registration of a mark which a

court finds "was granted contrary to the provisions of this Act." An application to register a mark must contain, *inter alia*, "[t]he date when applicant first used the mark in this State \*\*\*" and "[a] statement that the applicant verily believes that he is owner of the mark, and that no other person has the right in this State to use such mark either in the identical form thereof, or in such near resemblance thereto, as to be likely, when applied to the goods or services of such person, to cause confusion, or to cause mistake, or to deceive." Ill. Rev. Stat. 1981, ch. 140, pars. 10(e), (f).

The plaintiffs advance three reasons in support of cancelling Egyptian's registration. First, Egyptian had not actually used the mark in commerce at the time of its latest application. Second, Egyptian stated in that application that it had first used the mark in August 1982, despite the fact that its restaurant was not opened until late November of that year. Third, Eversden, as president of Egyptian, affirmed in that application that he believed that no other person in Illinois had the right to use that mark in that or a similar form. In fact, Eversden admitted at trial that he knew of the Mt. Vernon "Prime Time" restaurant and the plaintiffs' plans to expand to Carbondale at the time of Egyptian's application to register the service mark.

■ We agree with the plaintiffs' argument. The failure of Egyptian to adopt and use the "Prime Time" mark at the time of its application to register it would alone justify cancellation of the registration. (*El Sombrero Corp. v. Bolivar* (1982), 106 Ill. App. 3d 925, 436 N.E.2d 733.) However, Egyptian's application also contained false statements concerning the date of the first use of the mark and concerning the knowledge of Eversden about the use of similar marks within Illinois. The making of knowingly false representations on such an application is further reason to cancel registration of a mark. (Ill. Rev. Stat. 1981, ch. 140, par. 16(A)(4)(d).) That portion of the court's judgment denying that relief must be reversed.

■ Finally, the plaintiffs contend that they should be awarded attorney fees and damages resulting from this action. The prevailing party in an action to cancel the registration of a mark may be awarded attorney fees in the discretion of the court. (Ill. Rev. Stat. 1981, ch. 140, par. 16(c).) But, any person who "shall \*\*\* procure the filing of any application or registration of any mark in the office of the Secretary of State \*\*\*, by knowingly making any false or fraudulent representation or declaration, \*\*\* *shall be liable* to pay all reasonable expenses and all damages sustained in consequence of such filing or registration, to be recovered by or on behalf of the party in-

jured thereby ***." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 40, par. 18.) Having found that at least two material statements on Egyptian's application to register the "Prime Time" service mark were made with knowledge of their falsity, we are obligated to award the plaintiffs damages. In our opinion, this includes attorney fees resulting from that portion of this action involving the cancellation of the registration of the service mark. This cause must be remanded to determine the amount of those damages.

In conclusion, the judgment of the circuit court of Jackson County is affirmed insofar as it grants the plaintiffs injunctive relief. The portion of that judgment denying the plaintiffs' request to order cancellation of Egyptian's service mark and award them attorney fees and damages is reversed. The cause is remanded for assessment of the amount of attorney fees and damages.

Affirmed in part, reversed in part, and remanded.

KARNS and KASSERMAN, JJ., concur.