USTRUST, United States Trust Company and UST Corporation, Plaintiffs,

v.

UNITED STATES TRUST COMPANY OF NEW YORK, Defendant.

No. Civ.A. 99–12484–REK.

United States District Court, D. Massachusetts.

July 24, 2002.

Mark G. Matuschak, Jeffrey B. Rudman, Richard W. O'Neill, Vinita Ferrera, Hale & Dorr, Boston, MA, Gregory P. Teran, Hale and Dorr, Boston, MA, for USTrust, United States Trust Company, UST Corporation.

William L. Patton, Ropes & Gray, Boston, MA, I. Stephen Samuels, Samuels, Gauthier & Stevens, Boston, MA, Lee C. Bromberg, Kerry L. Timbers, Julia Huston, Lisa M. Fleming, Bromberg & Sunstein, Boston, MA, for United States Trust Company of New York.

Opinion and Order

KEETON, District Judge.

I. Pending Procedural and Related Matters

The various procedural and related matters that remain pending for decision before I address the merits of this suit are as follows:

(1) Plaintiffs' Motion *in Limine* to exclude the testimony of Christopher C. Barry (Docket No. 258, filed February 8, 2002);

(2) Plaintiffs' Motion *in Limine* to admit John Morse affidavit (Docket No. 281, filed April 19, 2002);

(3) Plaintiffs' Motion *in Limine* to admit documents concerning Schwab's purported referral policy and the U.S. Trust New York–Schwab merger (Docket No. 282, filed April 19, 2002);

(4) Plaintiffs' Motion *in Limine* to preclude the testimony of Eugene N. White (Docket No. 282, filed April 19, 2002);

(5) Defendant's Motion *in Limine* to exclude the July 7, 1987 affidavit of John Morse (Docket No. 284, filed April 18, 2002);

(6) Defendant's Motion *in Limine* to exclude all evidence resulting from unauthorized ex parte contact with employees of Charles Schwab (Docket No. 285, filed April 18, 2002);

(7) Defendant's Motion for Leave to file papers under seal (Docket No. 286, filed April 18, 2002);

(8) Defendant's Motion *in Limine* to exclude documents relating to settlement negotiations (Docket No. 287, filed April 18, 2002);

(9) Defendant's Motion *in Limine* to exclude plaintiff's proposed trial exhibit AV and the testimony of Richard M. Starfield concerning the proposed exhibit (Docket No. 288, filed April 18, 2002);

(10) Plaintiffs' Motion for Leave to file papers under seal (Docket No. 289, filed April 19, 2002);

(11) Defendant's Motion for Leave to file memorandum in excess of 20 pages (Docket No. 291, filed April 22, 2002);

(12) Defendant's Motion for Leave to file papers under seal (Docket No. 297, filed April 23, 2002);

(13) Plaintiffs' Motion for Leave to file papers under seal (Docket No. 305, filed April 25, 2002);

(14) Plaintiffs' Motion for Leave to file memorandum in excess of 20 pages (Docket No. 306, filed June 3, 2002); and

(15) Defendant's Motion for Leave to file supplemental findings of fact regarding calculation of USTC's profits (Docket No. 346, filed June 3, 2002).

All the motions *in limine* enumerated above are DISMISSED in the Order below. During the course of the trial, I heard and considered arguments concerning each of these matters, and made appropriate evidentiary rulings.

All the motions for leave to file papers under seal and for leave to file memoranda in excess of 20 pages are ALLOWED in the Order below.

Defendant's Motion for Leave to file supplemental findings of fact regarding calculation of USTC's profits (Docket No. 346, filed June 3, 2002) is DENIED in the Order below for the reasons set forth in Part VIII of this Opinion.

## II. Procedural History of the Case

Plaintiffs in this civil action are US-Trust, United States Trust Company, and UST Corp. As I explain more fully below, after a series of acquisitions and corporate changes, more entities than those in the caption above have an interest in the outcome of this civil action. The principal plaintiff is United States Trust Company of Boston, a money management subsidiary of Citizens Financial Group. To aid a reader's understanding of the merits, ordinarily I will refer to this entity and all entities aligned with it as "the Boston Entities" or as the plaintiffs.

The defendant in this civil action is United States Trust Company of New York. As I explain more fully below, it too has undergone various changes, has used slightly different versions of its name, and has become allied or associated with other entities who are not named in the caption. To aid a reader's understanding of the merits, ordinarily I will refer to this entity and all entities aligned with it as "the New York Entity" or as the defendant.

The Boston Entities filed this civil action on December 6, 1999. (Docket No. 1). The Boston Entities sought "a declaratory judgment that the plaintiffs, ... do not infringe any trademark or other rights of the defendant, ... through the use of an internet domain name "ustrustboston.com." " (Docket No. 1 at ¶ 1).

On December 28, 1999, the New York Entity filed its Answer and Counterclaims. (Docket No. 3). The New York Entity brought six counterclaims: (1) Trademark Cyberpiracy under 15 U.S.C. § 1125(d); (2) Federal Trademark Infringement under 15 U.S.C. § 1114; (3) Federal Unfair Competition under 15 U.S.C. § 1125(a); (4) Federal Dilution under 15 U.S.C. § 1125(c); (5) Unfair Competition under Mass.Gen.Laws ch. 93A §§ 2 & 11; and (6) Trademark Dilution under Mass.Gen. Laws ch. 110B §§ 9 & 12. (Docket No. 3 at pp. 7–11). Along with damages, the New York Entity sought a permanent injunction against the Boston Entities "from using the U.S. TRUST and UNITED STATES TRUST COMPANY marks in its domain name or in any manner on [their] website." (Docket No. 3 at p. 11).

On April 12, 2000, after receiving permission from this court to do so, the Boston Entities filed an Amended Complaint (Docket No. 19). The amended complaint included five counts: (1) Declaratory Judgment of Noninfringement; (2) Federal Unfair Competition under 15 U.S.C. 1125(a);

(3) Trademark Infringement under Mass. Gen.Laws ch. 110B §§ 9 & 12; (4) Trademark Dilution under Mass.Gen.Laws ch. 110B §§ 9 & 12; and (5) Unfair Competition under Mass.Gen.Laws ch. 93A §§ 2 & 11. (Docket No. 19 at pp. 9–12). In addition to the request for a declaration regarding the domain name, the amended complaint included a request that the court

Preliminarily and Permanently enjoin United States Trust Company of New York and its predecessors, successors, divisions, subsidiaries or joint ventures thereof, together with any and all parental or affiliated companies or corporations, and all officers, directors, employees, agents, attorneys, representatives, and those acting in privity or concert with them, and each of them, from further infringing and diluting USTrust Boston's USTRUST and UNITED STATES TRUST trademarks, or from using any other mark, brand, or designation in the Commonwealth of Massachusetts that is likely to be confused with or to dilute USTrust Boston's trademarks, or from engaging in further unfair competition ...

(Docket No. 19 at p. 13).

The New York Entity's Answer and Counterclaims to the Amended Complaint did not alter its counterclaims or prayers for relief in any substantive way. (Docket No. 20, filed May 8, 2000).

The docket sheet for this civil action reflects 366 filings to date. The court held a 12–day nonjury trial, commencing on April 29, 2002 and concluding on May 28, 2002.

### III. A Tale of Two Contenders

*A. Introduction*

It was the best of times, it was the worst of times, it was the age of wisdom, it was the age of foolishness, it was the epoch of belief, it was the epoch of incredulity,

it was the season of Light, it was the season of Darkness, it was the spring of hope, it was the winter of despair, we had everything before us, we had nothing before us, we were all going direct to Heaven, we were all going direct the other way—in short, the period was so far like the present period, that some of its noisiest authorities insisted on its being received, for good or for evil, in the superlative degree of comparison only.

CHARLES DICKENS, A TALE OF TWO CITIES 1 (Oxford Univ. Press, 1953) (1859).

Well taught English students know that the lines quoted above refer, literally, to Paris and London in 1775. Figuratively, they serve well to set the tone for the ensuing tale about two enterprises that were known slightly more than a century after Charles Dickens' two cities as two trust companies contending for the business of large investors.

## B. History of United States Trust Company of New York

Defendant, at various times and in various circumstances, has used the names U.S. Trust and United States Trust, although its official corporate name has always been United States Trust Company. (Exhibits 694 and 702); (Transcript of Day 8, Docket No. 340, filed May 24, 2002, pp. 62–63).

As part of its case in chief, defendant offered the expert testimony of Prof. Eugene Nelson White. Professor White was asked by the defendant to do research and make a report about whether the Boston Entities "would have been aware of United States Trust Company of New York's existence in 1895." (Transcript of Day 9, Docket No. 341, filed May 24, 2002, pp. 10–11). The following account of the New York Entity's history comes from Prof. White's testimony, supplemented by the testimony of Jeffrey Maurer, Chairman and C.E.O. of the New York Entity.

The New York Entity was created by a Special Act of the New York legislature in 1853. (Exhibit 501). It officially opened on August 2, 1853 with an initial capital stock of $2,000,000.00. (Exhibits 509, 699 & 707). Founded by, among others, Peter Cooper, Jacob Westervelt, Marshall Field, Erastus Corning, and John Cisco, it is the nation's oldest trust company. (Exhibits 744 & 745). Since 1853, the New York Entity has operated as a trust company with its headquarters in New York City. The New York Entity's first headquarters consisted of two rented offices at 40 Wall Street. (Exhibit 707). From 1857 to 1889, it was headquartered at 48 Wall Street. (Day 8, p. 93). From 1889 to 1989, it was headquartered at 45 Wall Street, in a building that bore the name "United States Trust Company" on the lintel. A new building was constructed on the same site in 1959. (Day 8, p. 93; Day 9, p. 24; Exhibit 707). In 1989, the defendant moved to 114 West 47th Street, where it remains today. (Day 8, p. 87).

Since its creation, the New York Entity has continuously used the mark UNITED STATES TRUST COMPANY for fiduciary, investment management, and trust services. As early as 1859, it had public notices published in THE NEW YORK TIMES. (Exhibit 502). Before 1895, when the Boston Entities changed to the name United States Trust Company, references to the New York Entity appeared in national and regional publications, including the COMMERCIAL & FINANCIAL CHRONICLE, the BOSTON EVENING TRANSCRIPT, and THE NEW YORK TIMES. Between June 23, 1888, and July 20, 1895, at least 47 references to the New York Entity appeared in the COMMERCIAL AND FINANCIAL CHRONICLE, a publication that Prof. White referred to as "the equivalent of the WALL STREET JOURNAL today."

(Exhibit 752; Day 9, p. 37, lines 4–5). Of these, the majority were stock quotes or lists of assets (*e.g.*, Exhibits 566–70, 564, 575), although a few were advertisements (*e.g.*, Exhibits 577, 578). Also, on at least three dates a report of the assets and liabilities of the New York Entity appeared in the COMMERCIAL AND FINANCIAL CHRONICLE. (Exhibit 756). Similarly, between April 1, 1878 and January 17, 1890, the assets and liabilities of the New York Entity appeared in THE NEW YORK TIMES at least 12 times, and as many as 15 other references, including lists of assets and an article about the construction of the New York Entity's building on Wall Street appeared between February 10, 1859 and January 17, 1890. (Exhibits 759 & 762). At least 18 references to the New York Entity appeared in the BOSTON EVENING TRANSCRIPT between July 3, 1893 and April 24, 1895, most of which were short articles or notices regarding railroad or government bonds. (Exhibit 774). And at least nine references to the New York Entity appeared in publications described by Prof. White as being "widely read by the banking community" between July of 1885 and June of 1895. (Day 9, p. 68; Exhibit 781).

The New York Entity's customers were "extraordinarily wealthy and well-known individuals." (Day 9, p. 19). They included William Waldorf Astor, Jay Gould, and Oliver Harriman. (Exhibit 745). By 1886, the New York Entity had over $30,000,000.00 in deposits. (Exhibit 698). In 1894, Woodrow Wilson used it as an agent for the transfer of bonds. (Exhibit 696).

In the 19th Century, the New York Entity administered major securities and played a role in financing westward railroad expansion. By 1895, according to Prof. White, it was both the largest trust company and the largest bank in the coun-try. (Day 9, p. 34; Exhibit 748). In 1898, it remained the largest of all trust companies. (Exhibit 747).

In 1936, the New York Entity had dropped to the 82d largest bank in the United States. (Exhibit 749).

In 1903, on the occasion of its 50th Anniversary, the New York Entity published a book recapping the previous 50 years of its history. (Exhibit 701). An April 15, 1969 article in TIME magazine reported that no institution managed more "Other People's Money" than the New York Entity. (Exhibit 700). Several newspapers marked the occasion of the New York Entity's 75th anniversary in 1928 with articles or special announcements. (Exhibit 705).

On July 25, 1967, the New York Entity registered the mark UNITED STATES TRUST COMPANY. (Reg. No. 832,693, Exhibit 709). That mark was renewed on July 25, 1987. (Exhibit 612). On September 19, 1967, the New York Entity registered the mark UNITED STATES TRUST. (Reg. No. 835,658, Exhibit 708). That mark was renewed on September 19, 1987. (Exhibit 611). On September 26, 1967, the New York Entity registered the mark UNITED STATES TRUST COMPANY OF NEW YORK. (Reg. No. 836,-090, Exhibit 710). That mark was renewed on September 28, 1987. (Exhibit 613). On October 17, 1978, the New York Entity registered the mark U.S. TRUST. (Reg. No. 1,104,469, Exhibit 711). That mark was renewed on October 17, 1998. (Exhibit No. 614). On September 29, 1992, the New York Entity registered the mark "A TRADITION OF GROWING ASSETS and U.S. TRUST." (Reg. No. 1,721,170, Exhibit 712). Each registration identifies the New York Entity as providing banking, fiduciary, and investment services.

Over the past two decades, the New York Entity has opened "affiliate" offices

in California, Texas, New Jersey, Florida, Connecticut, Oregon, New York, the District of Columbia, North Carolina, Delaware, and Minnesota. (Day 8, pp. 112–116). It has not opened any offices in Massachusetts or New Hampshire. (Day 8, p. 14). Since the mid–1990s, the New York Entity has owned and maintained a website at <http://www.ustrust.com>. (Day 8, p. 110).

## C. History of United States Trust Company of Boston

Plaintiffs were originally chartered under the laws of the Commonwealth of Massachusetts in 1887, under the name United States Safe Deposit and Trust Company. The General Court of the Commonwealth of Massachusetts changed the name to United States Trust Company on February 8, 1895. (Exhibit 1).

On January 24, 1895, the BOSTON NEWS BUREAU published a notice that indicated that the plaintiffs, under the name United States Trust Co., would begin business March 1 of that year, with $250,000.00 capital and $50,000.00 surplus. (Exhibit 782). That notice also indicated that the plaintiffs had leased the property at 28 & 30 Court Street for $7,000.00 per year for an unidentified term. *Id.* Notices concerning the Boston Entities appeared in the BOSTON DAILY ADVERTISER and the BOSTON EVENING TRANSCRIPT in early March of 1895. (Exhibits 514, & 520). As early as 1895, entries concerning the Boston Entities appeared in the same editions of BANKER'S MAGAZINE in which entries or advertisements appeared concerning the New York Entity. (Day 9, p. 139; Exhibits 558 & 559). Around the same time, the Boston Entities also placed advertisements in the BOSTON DAILY ADVERTISER. (Day 9, pp. 162–64; Exhibit 520).

The Boston Entities were founded by, among others, Abraham C. Ratshesky and Irving A. Ratshesky. (Transcript of Day 1, Docket No. 311, filed May 2, 2002, p. 49). The great-nephew of the Ratshesky's, Alan R. Morse, Jr., testified as follows concerning the reasons the Boston Entities were founded:

Q. Do you have any knowledge about the reason why United States Trust Company was founded by your great-uncles?

A. Yes. I'm told by my dad that it was started by the Ratsheskys because there were no banks in Boston at that time who were interested in and willing to help finance particularly immigrant populations, and that would include the Jewish populations and Irish populations in particular at that time. And so the bank was formed based on an interest that would be useful, both for the community and also would be good for business, since that business had been ignored up until that time.

(Day 1, p. 50).

For most of their history, the Boston Entities were owned, at least in part, by a member of the Ratshesky family. (Exhibit 336; Day 1, p. 49). In 1971, Barclay's Limited acquired UST Corp., the holding company that owned the Boston Entities. (Transcript of Day 2, Docket No. 312, filed May 2, 2002, pp. 17, 78). The Boston Entities continued to be known as United States Trust Company, and Barclays' Limited, the holding company, changed its name to UST Corp. (Day 2, p. 78). The holding company continued to acquire banks, always changing their names to USTrust. (Day 2, pp. 82–83). In 1980, in part because of a settlement reached with the New York Entity, which I describe more fully below in Part IV(C), the Boston Entities began to use the name United States Trust Company *of Boston* in Flori-

da and elsewhere outside of Massachusetts. (Day 2, pp. 91–92).

In 1914, the Boston Entities purchased the building at 30–40 Court Street in Boston, and at some time after that the name United States Trust Company was engraved on that building, where it remains today. (Day 1, pp. 70–71). The Boston Entities still maintain office space in that building. (Day 1. p. 71).

In 1995, the Boston Entities launched a website at <http://www.ustrustboston.com>. (Transcript of Day 3, Docket No. 313, filed May 2, 2002, p. 22; Transcript of Day 7, Docket No. 339, filed May 24, 2002, p. 52). At that time, the content of the website primarily concerned the retail banking portion of the Boston Entities' operations. (Day 3, p. 49). In 1996, a dispute arose between the Boston Entities and the New York Entity concerning that website. (Day 3, pp. 22, ff.). I describe that dispute more fully below in Part IV(E), but pause here to note that the dispute over the website was rekindled in October, 1999, precipitating this lawsuit. (Day 3, p. 41).

On January 11, 2000, a new holding company, Citizens Financial Group, acquired UST Corp. (Transcript of Day 6, Docket No. 338, filed May 24, 2002, p. 72). At that time, the retail bank USTrust was merged into Citizens Bank of Massachusetts, and the trust portion of the Boston Entities became a direct subsidiary of Citizens Financial Group. (Day 6, p. 73).

### D. Two Ships Passing in the Night

The advocates in this lawsuit have gone to great lengths to demonstrate that each side knew of the existence of the other.

As stated above, notices concerning both banks appeared in the BOSTON EVENING TRANSCRIPT in 1895. At least as early as 1940, both the Boston Entities and the New York Entity were publicly traded companies, whose listings appeared on the same page of THE NEW YORK TIMES. (Exhibit 2; Day 2, p. 19). Ten years later, then-President of United States Trust Company of New York Benjamin Strong attended the 60–year anniversary celebration of Old Colony Trust Company in Boston on June 14, 1950. Strong was seated at a head table, as was Alan R. Morse, Sr., President of United States Trust Company of Boston. (Plaintiffs' Exhibits 355, 356, & 357; Day 8, pp. 47–51).

Alan Morse, Jr., who, joined the Boston Entities in 1965 and, after holding several other positions in the Boston Entities, eventually became Chairman of their board, testified that he was aware of the existence of the New York Entity as early as 1962. (Day 1, pp. 46; Day 2, p. 22).

When James V. Sidell, owner of Barclay's Bank and Trust Company, purchased the Boston Entities in 1971, he became aware of the existence of the New York Entity. (Day 2, pp. 84–85). Specifically, Sidell testified that he learned of the existence of the New York Entity in the following way:

Q. Now, are you aware of a company called United States Trust Company of New York?

A. Yes.

Q. And when did you first learn there was a company called United States Trust Company of New York?

A. I believe when I acquired United States Trust, either the investment banker, a fellow named Morris Shapiro, or the guys at CitiBank who financed the acquisition for me, one or the other mentioned it in kind of a jocular way, and it's the first time I ever heard the name.

(Day 2, pp. 84–85).

Frederick B. Taylor, vice-chairman of the board of the New York Entity and its

chief investment officer, testified that he became aware of the existence of the Boston Entities "early in [his] career." (Transcript of Day 11, Docket No. 343, filed May 24, 2002, p. 35, ll. 24–25). On cross-examination, Mr. Taylor provided more specificity:

Q. Mr. Taylor, I believe you testified on direct that you began working at U.S. Trust of New York in around 1965; is that correct?

A. I think I said 1966.

Q. Okay. And, to the best of your knowledge, am I right, sir, that you heard about the Boston United States Trust Company sometime in the 1970s?

A. Many years have passed. That would be my best recollection.

Q. And so that would be somewhere between 20 and 30 years ago, is that fair, according to your best recollection?

A. Mid–'70s, yes.

Q. And when you learned about this other bank in Boston with the name United States Trust Company, you were surprised, were you not?

A. I had thought there was only one United States Trust Company.

(Day 11, pp. 36–37).

As stated in Part III(B) above, Professor Eugene White was asked by the defendants to research and report on whether the Boston Entities "would have been aware of United States Trust Company of New York's existence in 1895." (Day 9, pp. 10–11). At trial, Professor White testified regarding the knowledge of the parties in 1895 as follows:

Q. Professor White, do you have an opinion, based on your knowledge, training, and experience, and the research that you did in connection with this case, as to whether the founders of the United States Trust Company of Boston knew about the United States Trust Company of New York when the Boston bank adopted its name in 1895?

.    .    .    .    .

A. Yes, I do. I believe the founders of [the Boston Entities] did know of the United States Trust Company of New York because it was common knowledge within the financial industry that United States Trust Company of New York was the largest institution and a great innovator in the industry; and that the banking and financial business then, as it is today, is an information business and reading the newspaper and following what's going on is very important to do in order to properly serve your customers.

The record from many copies of the COMMERCIAL AND FINANCIAL CHRONICLE, BANKER'S MAGAZINE, NEW YORK TIMES, reflect the prominence of—actually, I'm sorry—the fact that—well, the prominence of United States Trust Company of New York as the leading institution with the largest assets of any banking company. They also report the individual operations of the United States Trust Company of New York in terms of its operating as a corporate trustee. Those are reported in the local newspapers in which, for example, Mr. Phelps[, one of the 17 founders of the Boston Entities,] advertised very frequently, changing his advertisement daily, so that he would probably monitor the newspaper to check for that. So he would certainly have received a copy of the BOSTON EVENING TRANSCRIPT, in which there are also notices of United States Trust Company's operations.

Similarly for Mr. Lord, who is another director of [the Boston Entities], he was an experienced banker, and experienced bankers would as a matter of common knowledge be following what's going on in their industry. And the industry leader being United States Trust Company of New York would be well known to, again, experienced bankers, particularly those who, again, wanting to serve. That's common knowledge. Also specific individual knowledge, again, wanting to invest their funds and to help their customers, either on a trust company basis or as a banking basis, in buying securities, they would have to read those newspapers on a regular basis in order to know what to do with the bonds, particularly when there's a new issue of bonds or when there is a reorganization or a bankruptcy. And since United States Trust Company of New York was a very big company, the biggest banking institution, and was very active in the government market, the railroad market, and the corporate market, it pretty much covered the map, so that it was involved in handling many, many different types of securities. And any experienced banker would in reading the newspapers come across ads about United States Trust Company of New York and very likely have to conduct some business with them.

(Day 9, pp. 104–06).

On cross-examination, Prof. White testified as follows:

Q. And, now, isn't it true, sir, that of the 17 original directors and officers of the Boston United States Trust Company, you can't tell me where any of them did their banking prior to 1895?

A. Well, some of them were members of the Manufacturers National Bank, were a member of the board of directors of the Manufacturers National Bank and were active in that bank as well. No, I can't say whether they held an account, but individuals at that time who were directors usually had an account in their bank.

Q. Alright. And the 17 founders of the Boston United States Trust Company, you can't tell me whether any of them ever worked in New York City; am I right?

A. No, not offhand.

Q. You can't say whether any of them ever traveled to New York City, correct?

A. No, I have no records of their travels.

Q. You don't know where any of them went to school; am I right?

A. I don't believe so.

. . . . .

Q. And I believe you testified on direct that you thought it was very likely that the founders of the Boston bank would have conducted some business with the United States Trust of New York. Did I get that correctly?

A. Yes.

Q. But you can't identify any specific piece of business that any one of those 17 specific people actually had with the New York bank, correct?

A. That's correct, I cannot identify any business.

. . . . .

Q. So in June, 1985, at the time that United States Trust Company [of New York] was advertising in BANKER'S MAGAZINE, there was informa-

Q. tion about the Boston bank in that same magazine, correct?

A. Correct.

Q. And I believe you told me last fall that it's likely that the New York bank read this magazine, correct?

A. That's correct.

Q. And if we look on the second page of [Exhibit 558], there's a heading called "Projected Banking Institutions"?

A. Yes.

Q. Right? And then there's a list of states and projected banking institutions in the variety of states, right?

A. That's correct.

Q. And there's a reference to Massachusetts, is there not?

A. Yes.

Q. And to Boston as well, right?

A. Yes.

Q. And the reference to Boston, at least the first one, is "United States Trust Company, A.C. Ratshesky, President, J.A. Lane, Vice President, I.A. Ratshesky, Treasurer." Do you see that?

A. Yes.

Q. And in your opinion, sir, persons affiliated with U.S. Trust of New York may well have read that listing for United States Trust Company of Boston in this publication, correct?

A. That's correct.

Q. And this was in February, 1895; is that right?

A. That's correct, that's the date of the magazine.

.    .    .    .    .

Q. Now, in the BOSTON DAILY ADVERTISER, we do find an ad for United States Trust Company, the Boston bank, correct?

A. Yes.

Q. And they actually call themselves United States Trust Company of Boston, . . . is that right?

A. Yes, in small print.

Q. In small print, fair enough. So this was a Boston paper in which the Boston bank advertised, correct?

A. Yes.

Q. And in all the research that you did for this case you didn't find any copies of the BOSTON DAILY ADVERTISER that have a reference to United States Trust Company of New York, correct?

A. Actually, I wish I had more time to do the work to go through and look at the BOSTON DAILY ADVERTISER and the other—having found originally references in the BOSTON EVENING TRANSCRIPT, I paid attention to that because I knew from previous work that that was a major newspaper which reported information on financial markets.

.    .    .    .    .

Q. In your work for this case, you did not focus on the BOSTON DAILY ADVERTISER, the one paper that you knew that the Boston bank advertised in? That's correct, is it not, sir?

A. I did not focus on the BOSTON DAILY ADVERTISER, yes.

(Day 9, pp. 130, 136, 139–40, 162–63).

I find, by a preponderance of the evidence, that in 1895, the directors and officers of the New York Entity and the directors and officers of the Boston Entities

each knew of the existence of the other bank.

Later, in 1977, the New York Entity and the Boston Entities briefly explored the creation of a formal relationship. The testimony by James Sidell concerning that interaction was as follows:

Q. Now, after you acquired United States Trust Company [of Boston], did you have contact on occasion with people from United States Trust Company of New York?

A. Yes.

. . . . .

Q. Now [Exhibit 17] is a letter to you from a Mr. Robert C. Cummins of United States Trust Company of New York dated July 12, 1977. Do you see that?

A. Yes.

Q. And do you know who Mr. Cummins was?

A. Well, the stationary says assistant treasurer.

Q. Now, the first sentence of that letter says, "Marshall Schwartz has forwarded to me your letter of June 2." Do you see that?

A. Yes.

Q. Do you know who Marshall Schwartz was?

A. President.

Q. Of what bank?

A. United States Trust Company of New York.

Q. And do you recall writing to Mr. Schwartz in June of 1977?

A. Yes. I must have dropped him a line telling him we were looking for a correspondent relationship.

Q. Now, the second sentence of Exhibit 17 says, "We are indeed very actively involved in building a national commercial banking effort, and a correspondent relationship such as you suggest could be to our mutual advantage." Do you see that?

A. Yes.

Q. And he goes on to say, "I should definitely like to explore the possibilities with you and will call for an appointment prior to my next trip to Boston, now scheduled for October." Do you see that?

A. Yes.

Q. Do you recall if you ever met with Mr. Cummins?

A. I don't believe so.

Q. Did anything come out of your proposal to develop a correspondent relationship between the two banks?

A. No.

Q. Now, during the course of the correspondence with the New York bank about the possibility of a correspondent relationship, did anyone from United States Trust Company of New York suggest to you that your bank couldn't use the name United States Trust Company?

A. No.

(Day 2, pp. 85–87).

IV. The Various Disputes
Between the Parties

A. *Introduction*

To say that the plaintiffs and defendant have "met before" would be a gross understatement. They have either engaged in or threatened to engage in litigation an unknown number of times. The times about which I received evidence are explained below.

## B. Early Sparring or "Round One"

The earliest dispute about the rights to use the various forms of the name U.S. Trust arose in 1978, and was short-lived. On March 13, 1978, James Sidell, who was the president of the Boston Entities at that time, wrote a letter to Tom Killefer, President of the New York Entity. (Exhibit 19). The text of the body of that letter was as follows:

> A recent issue of the *Wall Street Journal* published your notice of Annual Election of Trustees and Meeting of Stockholders to be held March 28, 1978, and we note that you have recently formed a New York business corporation with the name, "U.S. Trust Corporation".
>
> I am sure you know that since 1971, we have used the name "UST Corp." for our holding company for United States Trust Company here in Boston, and we are currently registering our name in New York. We have built up a substantial amount of good will associated with our name and naturally we are concerned about your recent use of a contraction of your new name which is identical to our legal corporate name.
>
> We do believe that both our interests would be best served by your avoidance of any contraction or variation of your name which would bear any similarity to the name of our holding company.
>
> We regard this subject as important and we would appreciate your reply to our thoughts.

(Exhibit 19). Sidell testified that his purpose in sending that letter was "to put [the New York Entity] on notice" of the name of the Boston Entities' holding company, UST Corp. (Day 2, p. 87).

Just over a week later, on March 21, 1978, Mr. Killefer sent his reply to Mr. Sidell, the text of which was as follows:

> Thank you for your letter concerning UST Corp.
>
> Neither we nor our counsel were aware that "UST Corp." is being used for your holding company in Boston.
>
> United States Trust Company in Boston and New York have used the name in their respective areas and have enjoyed an amicable relationship.
>
> We hope that this same relationship will continue with United States Trust Corporation.

(Exhibit 20). The dispute over the rights to the name did not proceed further at that point.

## C. Round Two: The Fight Over Florida

Sometime around March of 1977, the New York Entity opened an investment advisory office in Palm Beach, Florida. (Exhibit 335 at ¶ 7). Around January, 1980, the Boston Entities also opened a money management office in Palm Beach, Florida. (Day 2, pp. 88–89). On June 10, 1980, Daniel Davidson, the president of the New York Entity, sent the following letter to Paul Siskind, who was the Chairman of the Board of the Boston Entities at that time:

> I thank you for your letter dated June 2, received here yesterday, and enclose a photograph of the facade of your Palm Beach office. Looking at the photograph, it seems clear to me that a member of the public in Palm Beach would not be able to determine with certainty whether the bank, shown in the photograph, is a Boston bank with an office in Palm Beach or a New York bank with offices in Boston and Palm Beach.
>
> I urge that, to resolve this matter of confusion quickly, amicably, and permanently, you have your Palm Beach office agree to use (i) the name UNITED STATES TRUST COMPANY OF BOSTON, with all parts of that name ap-

pearing in letters of the same size, and (ii) the legend "Not connected with United States Trust Company of New York" on signage at its premises, on its letterhead, and in its advertising materials. I submit to you that public confusion, which concerns us both, will not be cured by any step short of that that I have suggested.

(Exhibit 334).

The letter identified as Exhibit 334 led to some discussions between the parties, but these discussions did not resolve the dispute and on June 24, 1980, the New York Entity filed a civil action against the Boston Entities in the United States District Court for the Southern District of Florida. (Day 2, pp. 89–91; Exhibit 335). That lawsuit was eventually settled. The terms of the settlement were laid out in the following letter, sent from Daniel Davidson to Paul Siskind on November 24, 1980 and countersigned by Siskind on December 9, 1980:

In order to terminate the action which we, United States Trust Company of New York, have instituted against you, United States Trust Company, in the United States District Court for· the Southern District of Florida, it is agreed between us:

1. That, in all respects, your present office in West Palm Beach, Florida, and any future office in Florida, but not elsewhere, shall be known as, and shall operate under the name, "United States Trust Company of Boston." That name shall be used exterior and interior signage at your offices in Florida; on stationary, business forms,· and all other paper circulated, communicated or distributed externally in Florida by your Florida and Massachusetts offices; in your Florida offices' telephone listings, press releases, and advertisements; and

in all other public displays in Florida of your offices' name. ·

2. The intent of the parties, in entering into this agreement, is to terminate the litigation aforesaid. It is understood and agreed that this Agreement shall not preclude the parties from hereafter taking such actions, against one another, as they deem necessary in order to protect their respective names and marks and the good will symbolized thereby in Florida and elsewhere.

(Exhibit 337).

### D. Round Three: The Connecticut Conflict

On April 2, 1987, the Boston Entities acquired Valley Bank & Trust Company in Bridgeport, Connecticut. (Day 3, pp. 8–9). Shortly thereafter, the name of that bank changed to USTrust/Connecticut. *Id.* That name change set off a series of "telephone calls, conversations, and discussions" between the New York Entity and the Boston Entities. (Day .3, p. 9). On May 14, Daniel Davidson, then Chairman and Chief Executive Officer of the New York Entity, sent a letter to Paul Siskind. (Exhibit 400). The text of that letter, in part, was as follows:

We object most strenuously to your attempt to establish a "U.S. Trust" bank in Connecticut. We cannot imagine how you could possibly have believed that your venture into Fairfield· County, a virtual suburb of this City, would not be viewed by us as a blatant challenge to our established proprietary rights in our market.

The name and mark U.S. Trust is, as you know, registered federally to us, as are our names·and marks United States Trust, United States Trust Company, and United States Trust Company of New York, and we have long and exten-

sively used those names and marks in Connecticut. Your use of the name "U.S. Trust" in Connecticut is, accordingly, most likely to cause public confusion and mistake, to our great and irreparable damage . . .

(Exhibit 400).

This dispute ultimately led to the New York Entity's filing of a motion for a preliminary injunction in the United States District Court for the District of Connecticut. (Day 3, p. 9; Exhibit 23). On August 28, 1987, Thomas F. Gilroy, Chief Judge of the United States District Court for the District of Connecticut, issued a preliminary injunction, the intent of which was:

> to enjoin [the Boston Entities] from using the name "USTRUST/CONNECTICUT" or "USTRUST" on or in connection with banking or financial services rendered within the state of Connecticut.

(Order of Clarification in Civil Action No. B 87–395 (TFGD), filed September 8, 1987, attached to Exhibit 686).

On a date that I am not able to discern from the evidence submitted in this case, the parties executed a Final Judgment on Consent, and submitted it for Chief Judge Gilroy's approval. The copy of that document, received into evidence as Exhibit 686, is not signed by the court, but all parties nevertheless consider the agreement binding.

*E. Rounds Four and Five: The Website of the Boston Entities*

In October of 1995, the Boston Entities launched a website at <http://www.ustrustboston.com>. (Day 3, p. 22; Day 7, p. 52). Later, the Boston Entities also registered the domain names <http://www.USTCorp.com.>, <http://www. USTBank.com>, and <http://www. TheOtherBigBank.com>, and had each of those addresses routed to the ustrustboston.com

website. (Day 7, p. 56). Early in 1996, the New York Entity expressed concern over the Boston Entities' website. On March 12, 1996, Eric Fischer, Executive Vice President and General Counsel for the Boston Entities, sent a letter regarding a settlement proposal to Maureen Scannell Bateman, Senior Vice President and General Counsel for the New York Entity. (Exhibit 31). The letter stated, in part:

> In accordance with our conversation, and after reviewing the draft letter you have sent me, we propose to modify UST Corp.'s Internet home pages. The pages with the proposed changes are being sent with this letter. We request that you review these pages, and advise us whether you have any comments. After we all agree to the proposed changes, we will instruct our web listing service to make the changes, thereby avoiding the need to devote further resources to the Internet issue.

(Exhibit 31).

In April of 1996, the Boston Entities changed their website by adding the words "of Boston" after each instance in which the words "US Trust" appeared on the website, and by changing any logos that contained the same word or phrase. (Day 7, pp. 61–62). That same month, Francis Scifo, a Vice President at the New York Entity, sent a letter to Eric Fischer. (Exhibit 32). That letter stated, in part,

> The following responds to your March 12, 1996 letter to General Counsel Bateman concerning [UST Corp.'s Internet homepage]. The revised homepages you forwarded have been reviewed and I take this opportunity to express our thanks for the cooperation extended by UST Corp. in this regard.
>
> I identified three instances of apparent inappropriate use of the term "USTrust"

on two pages in the revised materials. I presume they were oversights as the same term was adjusted in all other cases. Upon UST Corp.'s adoption of the suggested revisions, UST Corp.'s internet homepages will be acceptable to United States Trust Company of New York and this matter is closed.

(Exhibit 32).

The Boston Entities made the corrections referred to in that letter on April 10, 1996. (Exhibit 344; Day 7, p. 62).

In the spring of 1999, the dispute over the website of the Boston Entities was rekindled. On June 4, 1999, Parker Bagley, in his capacity as counsel to the New York Entity, wrote a letter to Paul Gupta, counsel for the Boston Entities regarding the dispute. (Exhibit 402). The text of that letter, in part, was as follows:

> As it appears that UST's use of the U.S. TRUST mark is not going to stop altogether, U.S. Trust is very concerned in limiting the geographic scope of such use. Under the law, UST is entitled to use the U.S. TRUST mark only in the geographic area of use it had established prior to U.S. Trust's federal registration of the U.S. Trust mark in 1978. Accordingly, we consider any use of U.S. Trust by UST in other than local media in eastern Massachusetts to be an infringement of U.S. Trust's incontestible trademark rights.

> Of particular concern is use on the Internet. . . .

(Exhibit 402). The letter went on to identify, among other things, instances in which the words "U.S. Trust" were not followed immediately by a designation of "-Boston" or "of Boston." *Id.*

The Boston Entities responded to this letter by correcting the omissions on its website. (Day 7, p. 63).

On October 27, 1999, Bagley again wrote to Gupta. This letter stated, in part, as follows:

> We have . . . just learned of UST's use of the domain name USTRUSTBOSTON.COM, which compels me to write again, as we consider this to be a separate and urgent matter.

> I discovered the use of USTRUSTBOSTON.COM during an internet search I was conducting to determine whether there were any new infringements of the U.S. TRUST mark . . . .

(Exhibit 403).

After receiving another communication from Gupta, Eric Fischer "was incredulous." (Day 3, p. 40). A little over a month after Bagley's letter to Gupta, on December 6, 1999, the Boston Entities initiated this lawsuit. (Day 3, p. 41; Complaint, Docket No. 1).

In January of 2000, after Citizens acquired the Boston Entities, the website was frozen, removed, and then replaced with new materials focusing on the trust management services offered by the Boston Entities. (Day 7, pp. 64–65).

### V. Activities of the New York Entity in Massachusetts

On November 30, 2000, Jeffery Mauer, Chairman and CEO of United States Trust Company of New York, wrote a memorandum to Richard E. Foley and Mark K. Talt, Managing Directors and Co–Chairs of National Sales and Marketing Committee, and to Martha Dinerstein, Managing Director and Head Marketing and Corporate Communications of the New York Entity. (Exhibit 376). The subject of that memorandum was "U.S. Trust's Expansion into Massachusetts." *Id.* The text of the memorandum was, in part, as follows:

> Although we have in the past few years generally sought to expand our services nationally, we have not specifically solic-

ited business from, or targeted our advertising to, Massachusetts' residents, nor have we had any specific plans to begin doing so.

However, we have now decided to pursue expansion into the Massachusetts market.

*Id.*

In that same year, the New York Entity attempted to purchase Pell, Rudman & Co., Inc., a Boston money management firm with approximately $5 billion in assets under management. (Day 8, p. 36). Included in the proposal regarding that acquisition, was the following statement:

With respect to the Pell Rudman brand name, it would be our desire to maximize Pell Rudman's brand, yet incorporate U.S. Trust's brand where it makes sense as expeditiously as possible. For the Boston market, we would temporarily keep the Pell Rudman brand, as we are precluded from using the U.S. Trust name there due to trademark issues in Massachusetts.

(Exhibit 447, p. 3).

Mr. Mauer testified that he had an "understanding" at the time his bank was attempting to acquire Pell Rudman that the Boston Entities would not open a bank in New York, and the New York Entity would not open a bank in Boston. (Day 8, p. 41).

Ultimately, the New York Entity did not acquire Pell Rudman. On May 31, 2000, however, the New York Entity did become associated with Charles Schwab & Co., Inc. On March 20, 2000, Joel Brickman, Senior Vice President and General Counsel of Citizens Financial Group, wrote to the Massachusetts Commissioner of Banks, informing the Commissioner of the proposed affiliation of the New York Entity and Schwab, and asking the Commissioner to:

require [the New York Entity] and its affiliates and proposed affiliates (including the Charles Schwab Corporation ...) to refrain (both directly and indirectly) from marketing financial services and soliciting under the names of "United States Trust Company" and "US-Trust" (or any similar derivation thereof) in a manner that specifically targets Massachusetts consumers for those services.

(Exhibit 787, pp. 1–2).

On April 28, 2000, Joseph A. Leonard, Deputy Commissioner of Banks and General Counsel of the Commonwealth of Massachusetts Office of the Commissioner of Banks wrote to Marshall Schwartz, Chairman and CEO of the New York Entity. (Exhibit 448). The letter stated, in part:

The Division of Banks is ... aware of the proposed transaction whereby the Charles Schwab Corporation would become affiliated with United States Trust Company of New York. The Charles Schwab Corporation maintains offices in the Commonwealth of Massachusetts....

The Division has consistently held the position that customers should never be confused regarding with whom they are conducting banking or financial business....

If the affiliation of United States Trust Company of New York with the Charles Schwab Corporation were to result in marketing in the Commonwealth of the United States Trust Company of New York directly or indirectly through the offices of the Charles Schwab Corporation, the Division's concerns would be triggered as a result of the continuing operation of United States Trust Company, Boston, Massachusetts. These concerns could rise to the level of whether United States Trust Company of New

York would be in violation of section 37 of chapter 167 of the Massachusetts General Laws. That statute governs unauthorized banking in the Commonwealth.

Due to the significance of these concerns, the Division would appreciate your informing us of any intended marketing of United States Trust Company of New York in the Commonwealth, particularly in light of the proposed affiliation with the Charles Schwab Corporation, and your analysis of the complications of any such marketing to the prohibitions of said section 37.

(Exhibit 448).

Richard Gross, Managing Director and General Counsel for the New York Entity responded to Mr. Leonard's letter on behalf of Mr. Schwartz on August 11, 2000. (Exhibit 42). That letter "confirmed the substance" of earlier telephone conversations between the two, and stated, in part, as follows:

1. The banking services of U.S. Trust are not currently being specifically marketed to investors residing within the Commonwealth of Massachusetts by either U.S. Trust [of New York] or Charles Schwab & Co., Inc. ("Schwab").

2. On May 31, 2000, the date on which U.S. Trust became affiliated with Schwab, all Schwab branches and offices in the Commonwealth were instructed to refrain from marketing any U.S. Trust banking services to existing or prospective Schwab customers residing in the Commonwealth.

*Id.*

The New York Entity's response concluded the review by the Commissioner of Banks. (Exhibit 788).

Jeffrey Mauer, testified as follows:

Q. Now, in your view, if someone comes into a Schwab office and asks about trust services in general and the Schwab employee refers that person to U.S. Trust of New York, that's marketing right?

A. Yes.

Q. But if the same person comes into a Schwab office and asks about trust services specifically from U.S. Trust New York and then they are referred to your bank, that's not marketing?

A. Correct.

Q. That's just a request for information?

A. Yes.

.        .        .        .        .

Q. Let me show you, sir, what's been previously marked as Exhibit 54. And do you see, sir, that Exhibit 54 consists of a series of letters from Mr. Luby to various people in Massachusetts?

A. Yes.

Q. And looking at the first letter of Exhibit 54, do you see it's on U.S. Trust of New York letterhead, correct?

A. Yes.

Q. And at the top of the page it does say "United States Trust company of New York," am I right?

A. Yes.

Q. And it gives an address in Lexington, Massachusetts, does it not?

A. Yes.

Q. And there are telephone numbers and fax numbers in the 781 area code, correct?

A. Yes.

Q. Now, this letter is to someone named Diane Hilliard, who, at least according to this letter, is chief fi-

nancial officer at Weston Presidio Capital in Boston; am I right?

A. Yes.

Q. And if you look with me to the third paragraph of the letter, do you see the words, "We would welcome the opportunity to work closely with you in enhancing the service and results that you and your limited partners achieve on your security trades and distributions. Based on our discussion, it is apparent that we could provide a real benefit to you and your limited partners"? Do you see that?

A. Yes.

Q. And would you consider that marketing, sir?

A. Yes.

(Day 8, pp. 30–33).

## VI. Services Provided

### A. The Boston Entities:

The Boston Entities have specialized in socially responsible investment management for at least 25 years. (Transcript of Day 4, Docket No. 336, filed May 24, 2002, p. 62). One subsidiary of the Boston Entities manages four socially responsible mutual funds: The Walden Social Balanced Fund, the Walden Social Equity Fund, the Walden Domestic Social Index Fund, and the Walden International Social Index Fund. (Day 4, p. 63). In managing its clients accounts, the Boston Entities expressly incorporate a multiple of components, including negative screening, positive screening, proxy voting criteria, community development investing, and shareholder activism. (Day 4, pp. 62–63). Between 35 and 40 percent of the Boston Entities' assets under management are invested in socially responsive investments. (Day 4, p. 68). The Boston Entities are regular participants in the Social Investment Forum and the Interfaith Center for Corporate Responsibility. (Day 4, p. 69).

Since 1998, the socially responsive investment division of the Boston Entities has been known as Walden Asset Management. (Day 4, p. 75).

Approximately 37 percent of the accounts currently held by the Boston Entities have tax domiciles outside of Massachusetts. (Transcript of Day 5, Docket No. 337, filed May 24, 2002, p. 29). Lucia B. Santini, Senior Vice President of one of the Boston Entities, testified that when she joined the company in 1982, some of the Boston Entities accounts that had been in existence since 1967 were for customers who lived outside of Massachusetts. (Day 5, p. 29).

### B. New York Entity

The New York Entity offered a document entitled "Socially Responsible Investing: U.S. Trust Overall Investment Philosophy" into evidence. The undated document was received as Exhibit 789 in evidence. Frederick Taylor, Vice Chairman and Chief Investment Officer for the New York Entity testified that the date of creation for the philosophy statement "could have been as far back as 1999 or something." (Day 11, p. 38). On re-direct examination, however, he testified as follows:

Q. Did your company have a socially responsible investing capability prior to 1999?

A. The Policy Committee first addressed the issue of socially responsible investing and developed its philosophy early on, and I cannot tell you precisely when that would be, but I'm reasonably confident it would have been in the '70s. And as I suggested earlier, there's a continuum here as to how one views

socially responsible investing. So what you saw there was a relatively recent version of something that had been developed over time, which is characteristic of investments generally.

(Day 11, pp. 77–78).

The New York Entity did not produce, and Mr. Taylor had not reviewed, any earlier versions of that philosophy statement. (Day 11, pp. 79–80).

The New York Entity has, at various times, subscribed to a stock screening service known as "SOCRATES." (Exhibit 790; Day 11, p. 22). Mr. Taylor testified that he could not identify the specific issues that SOCRATES screens for. (Day 11, p. 44). He also was unaware whether the New York Entity was a current subscriber to the service, or used it on an ad hoc basis. (Day 11, pp. 42–43). He also testified that, of the approximately 30,000 clients of the New York Entity's investment management services, the New York Entity had utilized the SOCRATES service for "only a handful" of them. (Day 11, pp. 44–45). Also, according to Mr. Taylor, the New York Entity neither currently has nor plans to have a socially responsible mutual fund. (Day 11, p. 50).

I find by a preponderance of the evidence that the primary services offered by the plaintiffs and defendant are substantially different. The Boston Entities have a unique ability to provide socially responsible investment services that the New York Entity simply does not provide at this time.

## VII. Legal Standards and Rulings of Law

This court has subject matter jurisdiction over this action, which at its heart is one for trademark infringement, under 15 U.S.C. §§ 1051 *et seq*, 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 15 U.S.C. § 1121.

The right to use a particular name, phrase, or symbol remains an essentially common law right. *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 815–16 (1st Cir.1987). Although registration serves an important function in our society, it does not create or destroy otherwise valid rights. Rather, trademark rights inure to the entity that uses the marks in a way that makes the public associate the marks with the entity, for good or for ill. *See id.* at 815. Similarly, under the law of the Commonwealth of Massachusetts, "one whose name has acquired secondary meaning in the minds of the public . . . has a right to have his trade name protected." *Planned Parenthood Fed. of Amer., Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 485, 498 N.E.2d 1044, 1047 (Mass.1986).

The United States Court of Appeals for the First Circuit has held that:

> To prevail in an action for trademark (or service mark) infringement, the plaintiff must establish: "1) that he uses, and thereby 'owns,' a mark, 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff."

*Star Financial Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5, 9 (1st Cir.1996) (Citation omitted).

The United States Court of Appeals for the First Circuit has also stated that:

> The Lanham Act § 33(b), 15 U.S.C. § 1115(b)(5) declares a "limited area" exception to that general premise of incontestability. . . . The essence of the exception embodied in § 1115(b)(5) is based on common law trademark protection for remote users established by the Supreme Court in *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), and *United*

*Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). Subsection (5) confers upon a junior user ... the right to continued use of an otherwise infringing mark in a remote geographical area if that use was established prior to the other party's federal registration. The junior user is permitted to maintain a proprietary interest in the mark even though it has no general federal protection through registration. To be able to invoke the § 1115(b)(5) exception, however, the junior user must have used the mark continuously in that location and initially in good faith without notice of an infringing mark. *Burger King of Florida, Inc. v. Hoots,* 403 F.2d 904, 907 (7th Cir.1968).

*Thrifty Rent–A–Car Sys., Inc. v. Thrift Cars, Inc.,* 831 F.2d 1177, 1180–81 (1st Cir.1987) (footnote omitted).

I find as a matter of fact that the New York Entity acquired limited rights to the marks U.S. TRUST and UNITED STATES TRUST COMPANY some time after 1853. I can not determine the date on which the usage by the New York Entity was sufficiently widespread for these rights to inure to it, nor can I determine the specific geographical reach of these rights.

I find that the Boston Entities acquired limited rights to those same marks some time after 1895 and before 1967. I also find that the Boston Entities adopted their names in good faith. And, further, I find that the New York Entity, before apparently changing its position after the case before me was in advanced stages of development, conceded that the Boston Entities had superior rights in Massachusetts.

█ In the circumstances of this case as they now exist, I do not find that the use of the marks by either party is likely to lead to confusion. First, the Boston Entities, with some exceptions that are most likely attributable to a lack of vigilance, append "of Boston" whenever they use the marks in trade. Second, the niches served respectively by the plaintiffs and the defendant, particularly with regard to the specialized socially responsive investing services of the Boston Entities, are distinct enough that consumers are unlikely to confuse the two. Third, the customer bases served respectively by the plaintiffs and defendant are composed of sophisticated investors with substantial sums at stake. These are not populations that are likely to mistake with whom they are dealing.

Finally, the Boston Entities with very few exceptions, use the mark exclusively in Massachusetts. Although they do have clients who reside elsewhere, referrals are overwhelmingly from their own customers or from employees in the Commonwealth. The few advertisements the Boston Entities place outside the Commonwealth are primarily fund-raising ventures for their clients, and when the Boston Entities do operate outside the Commonwealth, as they do when attending conferences on socially responsible investing, they use the "of Boston" designation.

With regard to the domain name "ustrustboston.com" and the Boston Entities' use of the website, I find as a matter of fact that the New York Entity acquiesced to this use and that, in any event, it is not an infringing use. *Cf. Ward Baking Co. v. Potter–Wrightington,* 298 F. 398, 404 (1st Cir.1924). The facts detailed above establish that officials for whose conduct the New York Entity is legally accountable knew, and also in the exercise of reasonable diligence should have known, that the Boston Entities were using the "ustrustboston.com" domain name, and that the only remedy the New York Entity demanded was the use of the word "Boston" following "U.S. Trust."

The parties in this case argued for far more during the course of the trial than they requested in the early pleadings in this case. Nonetheless, neither side is entitled to all the relief requested.

In the circumstances of this case, I determine that neither side has proved a claim for an award of money damages against the other.

Also, in the circumstances of this case, I determine that I must impose both fixed and variable limits on any decree because the markets in which the parties operate are volatile, and what might be an appropriate order with respect to rights, and limitations on rights, is likely to change. Therefore, I find that I can not appropriately issue a permanent injunction and instead will issue an order that is more like a preliminary injunction or temporary restraining order. This disposition will allow a party to file a motion for modification of the order now issued any time it can show a material change in circumstances.

Because of the various changes to the corporate status of the Boston Entities, I can not award plaintiffs a declaration of rights as sweeping as they seek. The current ownership of some rights that would otherwise be in the hands of the Boston Entities is in the hands of an entity (i.e., Citizens Financial Group) which for its own reasons may or may not assert them at some future time. But I also find that some of the rights that were in the past in one of the Boston Entities are still in the hands of one of the Boston Entities that has a legally and equitably enforceable interest, as against new owners of the acquiring entity, to assert this interest. A declaration regarding this legally and equitably enforceable interest will be a part of the order to be made forthwith. Stated another way, an entity that acquires the named defendant can not escape defenses that were good against the named defen-

dant in this case; and an entity that acquires or acquired one of the Boston Entities can not elect to surrender the rights held by another of the Boston Entities without showing a ground on which it has acquired such a right to surrender another entity's rights.

### VIII. Last–Minute Filings

On June 11, 2002, I issued a Memorandum and Order in this case to address several filings made by the defendant after the evidence in this case was closed. (Docket No. 354). In part, that Memorandum and Order stated as follows:

Without permission, defendant filed the following additional submissions after closing arguments:

(1) Amended Proposed Findings of Fact of United States Trust Company of New York (with original annotations by United States Trust Company) (Docket No. 345, filed May 31, 2002);

(2) United States Trust Company of New York's Motion for Leave to File Supplemental Findings of Fact Regarding Calculation of USTC's Profits (Docket No. 346, filed June 3, 2002);

(3) United States Trust Company of New York's Proposed Supplemental Findings of Fact Regarding Calculation of USTC's Profits (Redacted) (Docket No. 347, filed June 3, 2002);

(4) Memorandum in Support of Proposed Supplemental Findings of Fact Regarding Calculation of USTC's Profits (Redacted) (Docket No. 348, filed June 3, 2002);

(5) United States Trust Company of New York's Proposed Supplemental Findings of Fact Regarding Calculation of USTC's Profits (filed as Confidential) (Docket No. 349, filed June 3, 2002);

(6) Memorandum in Support of Proposed Supplemental Findings of Fact

Regarding Calculation of USTC's Profits (filed as Confidential) (Docket No. 350, filed June 3, 2002).

## II. Patterns of Conduct

Both parties have been inexcusably dilatory about complying with court orders regarding timely service and filing of proposed findings and conclusions. The conduct of defendant in this regard, especially after the time this case was submitted for decision, has been egregious, and substantially worse than plaintiffs'.

## III. Responsibility for Lateness

I find that defendant willfully engaged in a pattern of conduct with purpose to cause delay and to impose burdens on the opposing party in the hope of making it so expensive for plaintiffs to proceed with this civil action that plaintiffs would cave in.

## IV. Show–Cause Hearing

In view of defendant's egregious violation of the court's orders regarding timely service and filing of marked-up proposed findings and conclusions, the court gives notice in the Order below of a show-cause hearing with respect to what order or orders it is most appropriate for the court to make to redress the harm caused by defendant's conduct and to proceed with appropriate dispatch to final judgment or decree as to some part or parts or all parts of this case.

(Docket No. 354 at pp. 3–5).

On June 26, 2002, I held a Show–Cause Hearing, at which the defendant requested to have until July 15, 2002 to respond to what it perceived to be new allegations raised at the hearing regarding defendant's course of conduct. I allowed that request, and also gave plaintiffs until July 22, 2002 to file any further response.

The following documents were filed after the Show Cause Hearing of June 26, 2002:

(1) United States Trust Company of New York's Response to Untimely Allegations Regarding Discovery Conduct (Docket No. 359, filed July 15, 2002), with supporting redacted appendix of exhibits (Docket No. 360, filed July 15, 2002) and sealed unredacted appendix of exhibits (Docket No. 363, filed July 17, 2002); and

(2) USTrust Boston's Reply to Defendant's Memorandum Concerning Alleged Discovery Misconduct (Docket No. 367, filed July 22, 2002).

As I anticipated, these filings present little more than finger-pointing and cross-accusations of misconduct. The New York Entity, after setting forth excuses for its conduct and making assertions of misconduct against the Boston Entities, asks that I impose no sanction, but instead proceed promptly to adjudication of this case on its merits.

The Boston Entities request that I strike Docket Numbers 345–50 and determine that this is an "exceptional case" that warrants an award of attorneys' fees and costs.

The latest filings and the arguments of counsel presented at the Show–Cause Hearing of June 26, 2002, do not dissuade me from my original view, stated in the Memorandum and Order of June 11, 2002 and quoted above, that the New York Entity "willfully engaged in a pattern of conduct with purpose to cause delay and to impose burdens" on the Boston Entities. I therefore strike Docket Numbers 345–50 from consideration in this case.

I conclude also that both parties share responsibility for the delays and costs that have attended this litigation. For this reason, I decline to find this is an "exceptional

case" under 15 U.S.C. § 1117(a). The order below, therefore, awards no costs.

## ORDER

For the reasons explained above, it is ORDERED:

(1) Plaintiffs' Motion *in Limine* to exclude the testimony of Christopher C. Barry (Docket No. 258, filed February 8, 2002) is DISMISSED;

(2) Plaintiffs' Motion *in Limine* to admit John Morse affidavit (Docket No. 281, filed April 19, 2002) is DISMISSED;

(3) Plaintiffs' Motion *in Limine* to admit documents concerning Schwab's purported referral policy and the U.S. Trust New York–Schwab merger (Docket No. 282, filed April 19, 2002) is DISMISSED;

(4) Plaintiffs' Motion *in Limine* to preclude the testimony of Eugene N. White (Docket No. 282, filed April 19, 2002) is DISMISSED;

(5) Defendant's Motion *in Limine* to exclude the July 7, 1987 affidavit of John Morse (Docket No. 284, filed April 18, 2002) is DISMISSED;

(6) Defendant's Motion *in Limine* to exclude all evidence resulting from unauthorized ex parte contact with employees of Charles Schwab (Docket No. 285, filed April 18, 2002) is DISMISSED;

(7) Defendant's Motion for Leave to file papers under seal (Docket No. 286, filed April 18, 2002) is ALLOWED;

(8) Defendant's Motion *in Limine* to exclude documents relating to settlement negotiations (Docket No. 287, filed April 18, 2002) is DISMISSED;

(9) Defendant's Motion *in Limine* to exclude plaintiff's proposed trial exhibit AV and the testimony of Richard M. Starfield concerning the proposed exhibit (Docket No. 288, filed April 18, 2002) is DISMISSED;

(10) Plaintiffs' Motion for Leave to file papers under seal (Docket No. 289, filed April 19, 2002) is ALLOWED;

(11) Defendant's Motion for Leave to file memorandum in excess of 20 pages (Docket No. 291, filed April 22, 2002) is ALLOWED;

(12) Defendant's Motion for Leave to file papers under seal (Docket No. 297, filed April 23, 2002) is ALLOWED;

(13) Plaintiffs' Motion for Leave to file papers under seal (Docket No. 305, filed April 25, 2002) is ALLOWED;

(14) Plaintiffs' Motion for Leave to file memorandum in excess of 20 pages (Docket No. 306, filed June 3, 2002) is ALLOWED;

(15) Defendant's Motion for Leave to file supplemental findings of fact regarding calculation of USTC's profits (Docket No. 346, filed June 3, 2002) is DENIED;

(16) The Court strikes Docket Numbers 345–50; and

(17) The Clerk is directed to enter forthwith on a separate document a Judgment as follows:

For the reasons explained in the Opinion of July 24, 2002, it is ORDERED:

(1) The plaintiffs are declared to be lawful users of the domain name "ustrustboston.com";

(2) The plaintiffs are declared to be in lawful use of the marks USTRUST and UNITED STATES TRUST on their website at <http://www.ustrustboston.com> as long as they continue to append "of Boston" or "Boston" every time those terms are used;

(3) The plaintiffs are declared to be the owners of the marks USTRUST and UNITED STATES TRUST in Massachusetts and defendants are

enjoined from use of those marks in the Commonwealth;

(4) The defendants are declared to be the owners of the marks USTRUST and UNITED STATES TRUST COMPANY outside the Commonwealth of Massachusetts and plaintiffs are enjoined from use of those marks in all respects unless they append "of Boston" or "Boston" every time those terms are used;

(5) Plaintiffs have not proved a claim for an award of damages against defendant, defendant has not proved a claim for an award of damages against any of the Boston Entities, and the court makes no award of damages;

(6) When any entity who is a nominal party to this action, an unnamed party in interest to this action, or a successor to a named party or party interest can demonstrate a material change in circumstances that requires that this judgment be amended, that party may, and to obtain an amendment of this judgment must, file a motion in this court, with notice to all other nominal parties, parties in interest, and their successors; and

(7) No attorneys' fees and no costs are awarded.

## Judgment

For the reasons explained in the Opinion of July 24, 2002, it is ORDERED:

(1) The plaintiffs are declared to be lawful users of the domain name "ustrustboston.com";

(2) The plaintiffs are declared to be in lawful use of the marks USTRUST and UNITED STATES TRUST on their website at <http://www.ustrustboston.com> as long as they continue to append "of Boston" or "Boston" every time those terms are used;

(3) The plaintiffs are declared to be the owners of the marks USTRUST and UNITED STATES TRUST in Massachusetts and defendants are enjoined from use of those marks in the Commonwealth;

(4) The defendants are declared to be the owners of the marks USTRUST and UNITED STATES TRUST COMPANY outside the Commonwealth of Massachusetts and plaintiffs are enjoined from use of those marks in all respects unless they append "of Boston" or "Boston" every time those terms are used;

(5) Plaintiffs have not proved a claim for an award of damages against defendant, defendant has not proved a claim for an award of damages against any of the Boston Entities, and the court makes no award of damages;

(6) When any entity who is a nominal party to this action, an unnamed party in interest to this action, or a successor to a named party or party interest can demonstrate a material change in circumstances that requires that this judgment be amended, that party may, and to obtain an amendment of this judgment must, file a motion in this court, with notice to all other nominal parties, parties in interest, and their successors; and

(7) No attorneys' fees and no costs are awarded.